716 So.2d 387 (1998)
Kelly Darbonne CORMIER, et al., Plaintiffs-Appellees,
v.
T.H.E. INSURANCE COMPANY, et al., Defendants-Appellants.
No. 97-1143.
Court of Appeal of Louisiana, Third Circuit.
May 27, 1998.
Rehearing Denied July 17, 1998.
*389 Jeffrey Michael Bassett, James P. Ryan, Opelousas, J. L. Wimberly Jr., for Kelly Darbonne Cormier et al.
Richard Phillip Ieyoub, Edgar D. Gankendorff, Patrick B. McIntire, Asst. Attys., for State of Louisiana, Dept. of Public Safety & Corrections.
Scotty Joseph Venable, pro se.
Before SAUNDERS, SULLIVAN and GREMILLION, JJ.
GREMILLION, Judge.
In this appeal, the State of Louisiana, through the Department of Public Safety (DPSC), challenges the trial court's ruling finding it fifty percent at fault for the accident which caused injuries to Kelly Darbonne Cormier's young son, Blake, and awarding her damages on his behalf. We affirm in part and amend in part.

FACTS
On October 27, 1990, Kelly and her boyfriend, Scotty Venable, took her three children, Blake, Nicholas, and Brooke Cormier, to the Yambilee Festival in Opelousas, Louisiana. Blake was four years old, and Nicholas was six. Kelly took the two-year-old Brooke to the children's rides, while Venable allowed Blake and Nicholas to ride the adult rides. Eventually, Blake and Nicholas decided to ride the Scrambler, an amusement *390 attraction that was owned by Mitchell Brothers Amusements. After the ride began to spin, Blake and Nicholas became afraid and panicked, and Blake was somehow thrown from the ride and struck his head on a portion of the ride. The ride operator saw Blake fall and stopped the ride. He took Blake to the first aid station where he was attended to while waiting for an ambulance. Kelly was soon summoned to the first aid station where she found Blake.
Blake had a three-inch laceration on his head above his right ear and a two-inch depression in his skull underneath the cut. He was treated by Dr. Thomas Bertuccini, a neurosurgeon, who elevated the depressed portion of the skull and reconstructed the skull fragments.
Kelly filed suit against Deltus Mitchell d/b/a Mitchell Brothers Amusements; T.H.E. Insurance Company, Mitchell's insurer; and Louisiana Yambilee Association, Inc. Claims were later added against DPSC; First Financial Insurance Company, Yambilee's insurer; and the Eli Bridge Company, the Scrambler's manufacturer.
Eli Bridge was in bankruptcy when the case was scheduled for trial and was severed from the litigation. Yambilee and its insurer were dismissed without objection by the plaintiffs. The plaintiffs settled with Mitchell and its insurer, leaving only DPSC.
After a trial on the merits, the trial court found DPSC and Mitchell each to be fifty percent at fault. The trial court then assessed the damages as follows:

General damages, including physical and mental pain
and anguish, past andfuture, disability, and loss of
enjoyment of life for Blake Cormier.................$ 750,000.00
Past medical expenses for Blake Cormier............... 42,184.29
Future medical expenses for Blake Cormier............ 537,351.00
Loss of earning capacity for Blake Cormier............200,000.00
Lejeune damages for Kelly Cormier............ 25,000.00
Loss of consortium for Kelly Cormier.................. 25,000.00
TOTAL...................................$1,579,535.29

From this judgment, DPSC appeals and assigns sixteen assignments of error. Kelly answers this appeal and asks this court to increase the amount of general and special damages and the percentage of fault allocated to DPSC.

ASSIGNMENTS OF ERROR NUMBERS ONE THROUGH FIVE
In its first five assignments of error, DPSC claims that the trial court abused its discretion in assigning fault to it for not implementing the Amusement Ride Safety Law, La.R.S. 40:1484.1 et seq., because (1) it was impossible for DPSC to do so; (2) the Legislature refused to provide the funds necessary to do so, and an agency charged with implementing a law is excused therefrom when the Legislature fails to provide the requisite funds; (3) the ruling essentially imposes liability upon the Legislature, which cannot be held liable for failure to fund implementation of the Amusement Ride Safety Regulations, pursuant to the Doctrine of Legislative Immunity; (4) the Doctrine of Discretionary Immunity precludes imposition of liability upon DPSC; and (5) the Public Duty Doctrine precludes imposition of liability upon DPSC.
The plaintiffs alleged that DPSC was negligent in not establishing and enforcing certain rules and regulations prescribed by the Amusement Ride Safety Law. In finding DPSC at fault for the accident, the trial court stated:
I cannot accept the argument that simply because the legislature did not provide the up-front funding of this agency where it was shown that the fees would produce in excess of four hundred thousand dollars a year, which is more than they needed to enforce it, that their failure to just put the up-front money was the real reason why they didn't get into the business of enforcing this law. My personal opinion, I don't think they wanted to. However, I'm going to make this statement and I hope the legislators who pass these laws listen to this. They cannot take it upon themselves to make a finding that there is a danger with respect to particular activity in this state, pass legislation to remedy that danger and then just turn their backs and walk away from it. They can't do that. The law does not permit them to do that. Once they actively take a role in attempting to remedy a situation, they have the obligation to see it all the way through.... They had an obligation and an affirmative *391 duty to go forward with the funding of this, and for that reason I find them to be at fault.
The core of DPSC's argument relative to fault is that it cannot be held liable because the Legislature did not provide the necessary funding to implement the Amusement Ride Safety Law. DPSC asserts legislative immunity, discretionary immunity, and the public duty doctrine to support this claim.

Legislative Immunity
DPSC claims the trial court effectively imposed liability on the legislature for its decision not to provide funding for the implementation of the Amusement Ride Safety Law. Initially, we agree with the trial court that the State had an obligation and an affirmative duty to not only fund the program but to carry it out. While we also agree that a good portion of the trial court's reasons for judgment were addressed to the legislature, it is important to note that the trial court specifically rejected DPSC's argument that it lacked the funds to start the inspection program. Furthermore, if we were to follow DPSC's argument to its logical conclusion, every state entity would be immune from suit because all judgments against the State are eventually paid by the Legislature. Therefore, we find that the doctrine of legislative immunity is not available to DPSC. The legislative mandate is clear: protect the public by inspecting and certifying the safety of amusement attractions. DPSC receives substantial funding from the legislature. One can conclude that if the legislature continuously refused to provide start-up funds it was because it felt it had already appropriated the necessary funds to DPSC. Furthermore, once DPSC began enforcing the Amusement Ride Safety law, those funds initially expended would be recouped in a relatively short time.

Public Duty Doctrine
The public duty doctrine holds that a governmental agency is freed from liability for an otherwise actionable offense if the offense is a breach of duty owed to the general public, but conversely is not freed from liability if the duty is owed a particular class of individuals. Here, the duty is to protect those individuals wishing to enjoy amusement and carnival attractions. However, "the mere fact that a duty is of public nature, and benefits the general public, does not require a conclusion that the [governmental agency] cannot be found liable for the breach of that duty." Stewart v. Schmieder, 386 So.2d 1351, 1358 (La.1980). Clearly, the duty to protect individual carnival goers imposed on DPSC is a duty owed to a particular class of individuals and that duty is broad enough to cover the damages to a person in Blake's position. To allow DPSC to be shielded by the public duty doctrine would be tantamount to relieving it from any duty imposed under the law.

Discretionary Immunity
It is DPSC's position that it should be shielded from liability because it was impossible to implement the safety regulations because the Legislature failed to provide the funds necessary to accomplish that task. DPSC seeks immunity under La.R.S. 9:2798.1, which states that liability shall not be imposed on a state department "based upon the exercise or performance or the failure to exercise or perform their policy making or discretionary acts when such acts are within the course and scope of their lawful powers and duties." In Fowler v. Roberts, 556 So.2d 1 (La.1989), the Louisiana Supreme Court found that discretion exists only when a policy judgment has been made and that judicial interference in executive actions involving public policy is restrained by the discretionary acts exception. The court went on to state a two prong test to determine whether immunity should be granted:

Berkovitz v. United States, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), held that there is a two step inquiry for determining whether the discretionary function exception applies in specific fact situations. A court must first consider whether the government employee had an element of choice. "[T]he discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the *392 employee has no rightful option but to adhere to the directive." Berkovitz, 486 U.S. at 536, 108 S.Ct. at 1958-59, 100 L.Ed.2d at 540-41. If the employee had no discretion or choice as to appropriate conduct, there is no immunity. When discretion is involved, the court must then determine whether that discretion is the kind which is shielded by the exception, that is, one grounded in social, economic or political policy. If the action is not based on public policy, the government is liable for any negligence, because the exception insulates the government from liability only if the challenged action involves the permissible exercise of a policy judgment.
Id., 556 So.2d at 15.
The court in Fowler further found that "[i]f there is no room for an official to exercise a policy judgment, the discretionary function exception does not bar a claim that an act was negligent," and "[w]hen the government acts negligently for reasons unrelated to public policy considerations, it is liable to those it injures." Id. at 15-16.
The Amusement Ride Safety Law clearly requires a course of action to be taken by DPSC: implement a system of inspection of amusement rides for the protection of the public. Under this law, the secretary of DPSC "shall adopt and issue rules for the sale, installation, repair, maintenance, use, operation, and inspection of amusement attractions and rides ... to the extent necessary for the protection of the public." La. R.S. 40:1484.3. The legislature made the policy determination in this case and left it to DPSC to carry it out. We find that there is no room for DPSC to exercise a policy judgment and that it has no discretion concerning this directive. DPSC has no rightful option but to adhere to the directive of the legislature. Therefore, it cannot avail itself of the immunity provided for in La.R.S. 9:2798.1.
Furthermore, if discretion was involved, and we specifically hold that it was not, it was not the kind which would shield a government entity. It is the stated policy of the legislature that the public be protected from dangerous and defective amusement attractions. The failure to adopt and issue rules and regulations and implement those rules and regulations is not a discretion grounded in social, economic, or political policy which may be shielded by La.R.S. 9:2798.1. Our opinion is further buttressed by the comments found in La R.S. 40:1484.1:
House Concurrent Resolution 279 of the 1992 Regular Session provides in part:
"THEREFORE, BE IT RESOLVED that the Legislature of Louisiana does hereby urge and request the secretary of the Department of Public Safety and Corrections to implement the provisions of the Amusement Rides Safety Law and to adopt and issue rules required therein with the utmost diligence and promptness in the interest of public safety."
For the reasons set forth above, we find no merit in DPSC's first five assignments of error.

ASSIGNMENT OF ERROR NUMBER SIX
DPSC alleges that the trial court erred in finding it at fault because its duty to inspect the Scrambler was never triggered because Mitchell failed to notify it of the need for an inspection. La.R.S. 40:1484.4 requires an operator of a fair to notify the secretary of DPSC in writing at least thirty days before the opening of the carnival or fair and request an inspection. DPSC argues that its duty to inspect was not triggered because Mitchell did not notify DPSC of the Yambilee festival's opening. However, we find this argument unconvincing because DPSC never implemented a system to receive requests. We, therefore, reject this assignment of error.

ASSIGNMENT OF ERROR NUMBER SEVEN
DPSC contends that the trial court committed manifest error by assessing it with fifty percent of the fault in this accident. When allocating fault, the following criteria should be considered: (1) whether conduct resulted from inadvertence or involved awareness of the dangers; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; *393 (4) the capacity of the actors; and, (5) any extenuating circumstances which might require the actors to proceed in haste. Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985). There must be an ease of association between the complained of actions and the injury. Hill v. Lundin & Assocs., Inc., 260 La. 542, 256 So.2d 620 (1972). The greater the risk of harm to others created by a party's conduct, the greater that party's fault. Turner v. New Orleans Pub. Serv. Inc., 476 So.2d 800 (La. 1985).
In finding both Mitchell Brothers and DPSC to be equally at fault, the trial court stated the following:
Of course under Watson v. State Farm, which adopted the provisions of the Uniform Comparative Fault Act, it says that in assessing the nature of the conduct of the parties, various factors may influence the degree of fault or causation assigned, including: number one, whether the conduct resulted from inadvertence or involved an awareness of the danger. On the part of both Mitchell Brothers and the State, both were aware of the danger. The danger was made aware to Mitchell Brothers by the warning sent it by Eli Bridge. The State was aware of the dangers because it passed a law saying that it was dangerous and that it should be regulated. So both the State and Mitchell Brothers operated from a position of not just inadvertence but awareness of the danger involved in this case.... The capacities of the actors, I place them almost on equal footing. Mitchell Brothers operated this machinery, they knew it. The State apparently must know it because it decided it was going to regulate it. Therefore, both of them, as I find, operate at an equal level.
Although we agree with the trial court's evaluation of the actions of each actor, we find error in its allocation of fault. An analysis of the conduct of DPSC and Mitchell under the first part of the Watson test clearly reveals that Mitchell should have been assessed with a far greater portion of fault. Mitchell had actual knowledge of the dangers and chose not to take any measures to prevent such an accident. Furthermore, Mitchell ultimately had more control over the instrumentality of the harm and had specific knowledge that it was unsafe. Mitchell testified that he was advised by his insurer's inspectors to put a secondary latch on the Scrambler and that the operation manual for the Scrambler warned of the dangers of allowing small children to ride. DPSC's fault stems from its failure to implement an inspection scheme mandated by the legislature that possibly would have prevented this accident. We find DPSC's fault pale in comparison with that of Mitchell who had a specific knowledge that one of its rides was dangerous and chose not to take corrective measures.
Once an appellate court finds a "clearly wrong" apportionment of fault, it should adjust the award, but only to the extent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trial court or jury's discretion. Clement v. Frey, 95-1119, 95-1163 (La.1/16/96); 666 So.2d 607. After taking under consideration the facts of this case, we find that the highest percentage of fault that the trial court could reasonably have apportioned to DPSC is thirty-three percent. Therefore, the judgment of the trial court is amended accordingly.

ASSIGNMENTS OF ERROR NUMBERS EIGHT, NINE, TEN, AND ELEVEN
In these assignments of error, DPSC claims that the trial court committed manifest error by ignoring Blake's recovery; in rendering an award appropriate to a plaintiff suffering from severe deficits rather than mild deficits (which DPSC argues Blake evidences); and by rendering judgment on the basis of how well "typical" children with similar injuries are likely to do, claiming that Blake is not a typical brain injured child. DPSC further argues that the trial court erred manifestly by concluding that Blake will be unable to lead a normal adult life, attend college, and hold down a normal job. It also claims that the trial court abused its discretion by disregarding the entire testimony of Dr. John Bolter. In Lirette v. State Farm Ins. Co., 563 So.2d 850, 852-53 (La. *394 1990), the Louisiana Supreme Court discussed the reviewing court's role in evaluating the trial court's inferences of fact and evaluations of credibility:
It is well settled that a court of appeal may not set aside a finding of fact by a trial court or a jury in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.
When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.
The rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound.
[Citations omitted.]
Here, the trial court was presented with two versions of the extent of Blake's injuries. The trial court specifically found the testimony of the plaintiff's experts to be more credible than that of DPSC's expert, Dr. Bolter. We can find nothing in our review of the record that indicates that this determination was manifestly erroneous or clearly wrong; therefore, we find that this assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER TWELVE
DPSC asserts in this assignment of error that the trial court erred in its award of $537,351.00 for future medical expenses. We agree. In order to recover future medical expenses, one must establish them "with some degree of certainty, and awards will not be made in the absence of medical testimony as to the requirement for such expenses and their probable cost." Rowe v. State Farm Mut. Auto. Ins. Co., 95-669, p.20 (La.App. 3 Cir. 3/6/96); 670 So.2d 718, 730, writ denied, 96-824 (La.5/17/96); 673 So.2d 611. This court has previously discussed the award of future medical expenses in Veazey v. State Farm Mut. Auto Ins., 587 So.2d 5, 8 (La. App. 3 Cir.1991), where we stated the following:
Future medical expenses, like any other damages, must be established with some degree of certainty. The plaintiff must show that, more probably than not, these expenses will be incurred. Awards will not be made in the absence of medical testimony that they are indicated and setting out their probable cost. Boothe v. New Orleans Public Service, Inc., 447 So.2d 620 (La.App. 4th Cir.1984); Sikes v. McLean Trucking Co., 383 So.2d 111 (La.App. 3d Cir.1980). An award for future medical expenses cannot be based on mere speculation of the jury. Much stronger proof, such as medical testimony of the specific expenses to arise, should be required for such an award. Simmons v. Custom-Bilt Cabinet & Supply Co., 509 So.2d 663 (La. App. 3d Cir.1987); Sikes, supra.
DPSC questions whether there was sufficient evidence presented for the trial court to render judgment against it to the extent it did. In Isdale v. Carman, 96-1435 (La.App. 3 Cir. 4/2/97); 692 So.2d 687, 689-92 (citing Ambrose v. New Orleans Police Dep't Ambulance Serv., 93-3099, 93-3110, 93-3112 (La.7/5/94); 639 So.2d 216, 223-24), we noted the difference between an appellate court's review of fact versus sufficiency of the evidence.
The manifest error rule is a standard used by appellate courts to resolve conflicting factual evidence; it is not a standard for determining sufficiency of the evidence. The manifest error rule relates purely to questions of fact; sufficiency of the evidence, on the other hand, is a question of law, and the standard for determining sufficiency of the evidence relates to questions of law, or to mixed questions of law and fact.
In application, the manifest error rule becomes part of the standard for determining sufficiency of the evidence. The reviewing *395 court first resolves any factual conflicts by application of the manifest error rule which dictates that the appellate court should not disturb the express or implied factual findings of the trier of fact. (Footnote omitted). Accordingly, the reviewing court views all evidence in the light most favorable to the party who prevailed in the trial court, and then determines whether the evidence, consisting of the undisputed facts and of the disputed facts thus viewed under the manifest error rules, was sufficient to preponderate in favor of a conclusion that the plaintiff had proved every element of his cause of action.
We find that the evidence was insufficient for the trial court to award future medical expenses in the amount of $537,531.00. The court relied on a Life Care Plan devised by Dr. Robert Voogt. Dr. Voogt testified that as a rehabilitation specialist and counselor, he was not qualified to prescribe treatment or develop a prognosis. He was, however, qualified to recommend and suggest certain courses of treatment and that certain evaluations be performed. The Life Care Plan developed by Dr. Voogt was based on a review of Blake's medical records and two interviews with Blake and his mother. From this review, Dr. Voogt determined the future medical expenses for Blake, based in part on his evaluation of Blake's needs, and in part on what the typical person with Blake's similar injuries would require. The former basis rises to the level of proof required to award such expenses while the latter does not. Certain items of the Life Care Plan, such as two neuropsychological evaluations over the next eight years and certain counseling were recommended by Dr. Bouillon, Blake's treating psychologist.[1] Other items such as annual medical evaluations and treatment by a neurologist, psychiatrist, and ophthalmologist are supported by Dr. Voogt's testimony as an expert in the area of rehabilitation and counseling. Likewise, the trial court did not commit error in relying on Dr. Voogt's expertise to allow such items of treatment as occupational therapy and cognitive remediation even though the need for further occupational therapy was challenged by the testimony of Susan LeFleur, the occupational therapist who treated Blake and evaluated him before trial.[2]
However, such items as a vocational rehabilitation at age eighteen and a comprehensive, three month long, in-patient rehabilitation program after Blake reaches age eighteen are not supported by the record. Similarly, the amount allocated to support care is wholly unsupported by the record. Not one expert recommended support care or even indicated a need for such care. In fact, LeFleur testified that Blake can function independently. These portions of Dr. Voogt's Life Care Plan are based on conjecture and speculation and not supported by the evidence. Therefore, we find the trial court committed manifest error in awarding damages in the amount of $537,531.00 for future medical expenses and reduce that amount to $75,000.00.

ASSIGNMENT OF ERROR NUMBER THIRTEEN
DPSC submits that the trial court erred in not establishing a Medical Reversionary Trust for future medical expenses pursuant to La.R.S. 13:5106. However, we note that the accident occurred in 1990, and La.R.S. 13:5106 did not become effective until 1995, and the requirement of such a trust was not effective until the 1996 amendment to the statute. In Lemaire v. Estate of Harrington, 97-256 (La.App. 3 Cir. 10/8/97); 701 So.2d 484, we held that La.R.S. 13:5106 affected substantive rights, and, therefore, cannot be applied retroactively. As such, we find this assignment of error to be without merit.

ASSIGNMENT OF ERROR NUMBER FOURTEEN
In this assignment of error, DPSC alleges that the trial court abused its *396 discretion by awarding $200,000.00 for Blake's loss of earning capacity. Damages for lost earning capacity must be awarded where proven by a preponderance of the evidence, not by some higher standard. Moreover, it is to be observed that the component of relief styled as future lost earning capacity is not synonymous with damages awarded for future lost earnings. Burnaman v. Risk Management, Inc, 97-250 (La. App. 3 Cir. 6/18/97); 698 So.2d 17, 20.
In Batiste v. New Hampshire Ins. Co., 94-1467 (La.App. 3 Cir. 5/3/95); 657 So.2d 168, 170, writ denied, 95-1413 (La.9/22/95); 660 So.2d 472, the court explained:
Loss of earning capacity is not the same as lost wages. Rather, earning capacity refers to a person's potential. Earning capacity is not necessarily determined by actual loss. While the plaintiff's earnings at the time of the accident may be relevant, such figures are not necessarily indicative of his past or future lost earning capacity. The plaintiff need not be working or even in a certain profession to recover this type of award. What is being compensated is the plaintiff's lost ability to earn a certain amount, and he may recover such damages even though he may never have seen fit to take advantage of that capacity. Hobgood v. Aucoin, 574 So.2d 344 (La.1990).
In determining whether a personal injury plaintiff is entitled to recover for the loss of earning capacity, the trial court should consider whether and how much plaintiff's current condition disadvantages him in the work force. The trial court should thus ask itself what plaintiff might be able to have earned but for his injuries and what he may now earn given his resulting condition. Finnie v. Vallee, 620 So.2d 897 (La.App. 4 Cir.), writ denied, 625 So.2d 1040 (La.1993).
The very nature of lost earning capacity makes it impossible to measure the loss with any kind of mathematical certainty. The facts of each case must take into account a variety of factors, including the plaintiff's condition prior to the accident, his work record prior to and after the accident, his previous earnings, the likelihood of his ability to earn a certain amount but for the accident, the amount of work life remaining, inflation, and the plaintiff's employment opportunities before and after the accident. Finnie, 620 So.2d at 901.
A trial court's award for loss of earning capacity is reviewed under the manifest error standard of review. Detraz v. Hartford Accident and Indem. Co., 94-708 (La.App. 3 Cir. 12/7/94); 647 So.2d 576. The issue is not whether a different award may have been more appropriate, but whether the trial court's award is reasonably supported by the record. Id.
The trial court awarded Blake $200,000.00 for loss of earning capacity. Considering the evidence contained in the record and the inherently speculative nature of awards for loss of earning capacity, we find that the trial court had a reasonable basis for this award. Therefore, we find this assignment to be without merit.

ASSIGNMENT OF ERROR NUMBER FIFTEEN
Through this assignment of error, DPSC claims that the trial court was clearly wrong in awarding Blake $750,000.00 in general damages. In Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), the Louisiana Supreme Court discussed the standard an appellate court must apply when reviewing the award of general damages by a lower court.
The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963) through Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), and through Reck [v. Stevens, 373 So.2d 498 (La.1979)] to the present case is that the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable *397 persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
Considering the vast discretion afforded the trial court, we cannot say that the award of $750,000.00 is "beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances." Id., 623 So.2d at 1261. Clearly, the evidence supports this award for this very serious open head wound and the effect it has had on Blake. Therefore, we affirm the trial court's award of general damages.

ASSIGNMENT OF ERROR NUMBER SIXTEEN
In this assignment of error, we find DPSC alleging that the trial court erred in awarding Kelly Lejeune damages because she did not see the scene of Blake's accident. In Lejeune v. Rayne Branch Hosp., 556 So.2d 559, 570 (La.1990),[3] the supreme court concluded that mental pain and anguish claims arising from the injury to a third person are recoverable subject to the following restrictions:
1. The claimant must either view the accident or injury causing event or come upon the accident scene soon thereafter and before substantial change has occurred in the victim's condition.
2. The direct victim of the traumatic injury must suffer such harm that it can reasonably be expected that one in the claimant's position would suffer serious mental anguish from the experience.
3. The emotional distress sustained must be both serious and reasonably foreseeable. It must be beyond simple mental pain and anguish; it must be both severe and debilitating.
DPSC contends that the trial court erred in awarding Lejeune damages to Kelly because she did not view the accident or come upon the scene of the accident soon thereafter. DPSC points out that Kelly did not see Blake until after he was moved from the area of the Scrambler to the front area of the fair. While we agree that Kelly did not see Blake until he was taken to the first aid station at the front of the fairgrounds, we find that the temporal and geographical requirements of Lejeune are met.
In Trahan v. McManus, 94-167 (La.App. 3 Cir. 3/22/95); 653 So.2d 89, the parents of the decedent who died as a result of being mistakenly discharged from the hospital brought a claim for their mental anguish. This court found that the father did meet the requirements that he either view the event or come upon the scene soon afterward because "the continuing event was visited [upon him] almost instantaneously." Id. at 92. The testimony reveals that Kelly did see Blake just minutes after the accident and a short distance from the Scrambler. She testified that she tried to comfort him while he was lying on the ground. She said that she was worried that he might die, and that she was able to see what she thought was his brain because his "skull was cracked wide open." Clearly, Kelly was not removed far enough in time or space to prevent her from recovering these damages. For these reasons, we find that this assignment of error lacks merit.

ANSWER TO APPEAL
Kelly answers the appeal, and prays that the amounts for special and general damages be increased, that the percentage of fault assigned to DPSC be increased, and that the testimony excluded by the trial court be considered in making our decision.
Because we have already addressed the issues of fault and damages in this opinion, we will only consider her complaint concerning the excluded testimony of Mr. Safford, the bureau chief for the Fair Rides Inspections for the Florida Department of Agriculture. The testimony was offered to *398 show that had there been an inspection system in place, this Scrambler would not have been allowed to operate. The trial court did not allow this testimony into evidence on the grounds of relevance, holding that evidence of how another state enforces a similar regulation is not relevant in proving whether or not DPSC should have implemented the regulation to begin with. We agree.
We note that an appellate court must place great weight on a trial court's ruling on the relevancy of evidence and should not reverse such a ruling in the absence of a clear abuse of discretion. Krampe v. Krampe, 625 So.2d 383 (La.App. 3 Cir. 1993), writ denied, 630 So.2d 781 (La.1994). We find no such abuse on the part of the trial court. While Mr. Safford's testimony is certainly informative, we find that it offers little help to the finder of fact in determining fault in this case.

CONCLUSION
The judgment of the trial court finding DPSC to be fifty percent at fault in causing Blake's injuries is amended and reduced to thirty-three percent. Further, the trial court's award of $557,531.00 for future medical expenses is amended and reduced to $75,000.00. In all other respects the judgment is affirmed. The costs of this appeal shall be divided equally between plaintiff-appellee, Kelly Darbonne Cormier, and the defendantappellant, the State of Louisiana, through the Department of Public Safety and Corrections.
AFFIRMED AS AMENDED.
SAUNDERS, J., concurs with reasons.
SAUNDERS, Judge, concurring.
I concur in the result reached by the majority. In my view, the budgetary process conducted by the state legislature is one which should be reserved entirely to that body and I feel it would be a violation of the principle of separation of powers if the courts should undertake to regulate that process. In this regard, I would make two observations: (1) each citizen of the state is under an obligation to refrain from doing harm to others and, the fact that we may not have the resources to keep our property in good order, does not absolve us from harm we may cause by failing to do so. Subdivisions of the state should be held to the same standard as the people they govern. (2) Complaining about inadequate funding and failing to perform required duties is a time-honored and well-recognized technique used by agency heads in attempts to garner larger appropriations from the legislature. The argument of DPSC attempts to bring this budgetary haggling to a new forum by, in effect, asking the state judiciary to regulate the budgetary process. I believe that the framers of our constitution showed both wisdom and mercy[1] in shielding the judiciary from this exercise. In a word, I feel that the argument of DPSC invites this court to invade the legislative *399 province and that we do well to decline this invitation.
NOTES
[1] Dr. Bouillon treated Blake in 39 office visits.
[2] It was LeFleur's opinion that further therapy would not aid in his recovery and that "the challenges that he meets in every day activities is his best therapy."
[3] Because this cause of action arose prior to the passage of La.Civ.Code art. 2315.6, Lejeune v. Rayne Branch Hospital is applicable.
[1] It is this writer's studied opinion that the person who ultimately finds a cure for cancer will do so with less imagination than a typical agency head uses in annually securing a desired budget. I make this observation not as a criticism, but rather as a statement of admiration and respect for a group of unsung over-achievers who annually face a hostile review by persons who have sworn a blood oath to deny their requests and each year, emerge undenied. Nor is this a new phenomenon. These champions of the cause have been doing their magic for as long as this writer has been in a position to observe such things and, one suspects, a great deal longer.

Case in point: a young employee is hired on a temporary basis and is advised that he or she is working so well, that the backlog will soon be eliminated and with it, the employee. The employee slows down, and many years later, retires from the agency. The job and its funding become permanent.
Case in point: an agency nears the end of its fiscal year with a surplus in its budget. Action is required, additional space is rented, additional supplies and equipment are purchased and stored in the rented space, the surplus is eroded and the budget is protected.
These ploys are of another day. They are now well known and, one would hope, well guarded against. This author cites them only to underscore two salient points: first, that our state agencies are headed by very imaginative people who are fully capable of obtaining adequate funding for the causes they champion without judicial intervention and, secondly, that the judicial branch is desperately ill-equipped for invading the budgetary process.