STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

03-1273

ALEXIS DAVEY TAYLOR

VERSUS

ALLSTATE INSURANCE CO.

**********
APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 871,19-E
HONORABLE KEITH COMEAUX, DISTRICT JUDGE
**********

**GLENN B. GREMILLION**
**JUDGE**

**********

Court composed of Jimmie C. Peters, Michael G. Sullivan, and Glenn B. Gremillion, Judges.

**Peters, J., concurs in part and dissents in part, and would increase the plaintiff's damage award.**

AFFIRMED.

Charles Brandt
111 Mercury Street
Lafayette, LA 70503
(337) 237-7171
Counsel for Plaintiff/Appellant
        Alexis Davey Taylor

C. Shannon Hardy
Penny & Hardy
P. O. Box 2187
Lafayette, LA 70502-2187
(337) 231-1955
Counsel for Defendant/Appellee
        Allstate Insurance Co.

GREMILLION, Judge.

The plaintiff, Alexis D. Taylor, appeals the jury's damage award and factual findings, and the trial court's exclusion of evidence in favor of the defendant, Allstate Insurance Company. For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

This suit arises out of a motor vehicle accident that occurred in Iberia Parish, Louisiana, in August 1995. Taylor, who was sixteen years old at the time of the accident, settled with the other driver for the policy limits of $10,000, and liability is not at issue. In August 1997, she filed suit against her under-insured motorist policy carrier, Allstate, alleging that it was indebted to her for injuries resulting from the accident. A jury trial was held in October 2002. The jury made the following awards:

| | | |
|---|---|---|
| a) | Past and future pain and suffering | $50,000 |
| b) | Past and future mental anguish | $0 |
| c) | Loss of enjoyment of life | $0 |
| d) | Permanent disability | $0 |
| e) | Future lost wages | $0 |
| f) | Past medical expenses | $40,640.71 |
| g) | Future medical expenses | $0 |

Taylor now appeals.

## ISSUES

Taylor assigns as error:

1.  The jury's damage award.

1

2.      The jury's failure to find that Allstate was arbitrary, capricious, and without probable cause in making its tenders.

3.      The trial court's exclusion of evidence which was legally admissible and highly probative to her case.

## DAMAGES

Taylor urges that the jury erred in awarding her only $50,000 in past and future pain and suffering and in failing to award her damages for past and future mental anguish, loss of enjoyment of life, permanent disability, and future medical expenses.

**General Damages**

General damages include an award for the victim's pain and suffering, and, as such, are intrinsically speculative and not subject to mathematical certainty. *Wainwright v. Fontenot*, 00-0492 (La. 10/17/00), 774 So.2d 70. We review the jury's general damage award using the abuse of discretion standard set forth in *Coco v. Winston Industries, Inc.,* 341 So.2d 332 (La.1976). The jury is afforded much discretion in independently assessing the facts and rendering an award because it is in the best position to evaluate witness credibility and see the evidence firsthand. *Anderson v. New Orleans Pub. Serv., Inc.*, 583 So.2d 829 (La.1991). The award should be based on the facts and circumstances of the particular case. *Id.* Only if we find that the jury abused its discretion, may we lower or raise the award and resort to prior awards to the extent that is reasonably within our discretion. *Id.*

Dr. Francis Morvant, a chiropractor, first saw Taylor following the accident on September 13, 1995. She reported headaches, neck, lower back, shoulder, and wrist pain, and pins and needles and numbness in her arms. She treated with him

through February 1996, and reported the same types of problems at each visit. Dr. Morvant diagnosed her with a cervical sprain/strain, muscle spasms, ligament laxity, and tension headaches. He stated that he did not think Taylor was exaggerating her symptoms. Dr. Morvant did state that he had seen Taylor prior to the accident when she came in for maintenance adjustments at Pinhook Chiropractic where her father was employed as a business manager. On cross-examination, however, Allstate's counsel questioned him as to records indicating that Taylor had been treated at Pinhook for low back pain, neck pain, and headaches from January 1994, through December 1994, for an accident occurring in April 1993. Dr. Morvant did not recall those events and explained that someone else in the office may have treated her for that, but that he believed her visits were just well-care and preventative in nature. However, Pinhook medical records indicate that Taylor was seen throughout 1994, and the diagnosis was for an accident in April 1993. Further, records from range-of-motion tests prior to the August 1995 accident and post-accident were the same. Left rotation and right lateral flexion in the cervical motion part of the range of motion test were improved post-accident.

Dr. David Warren, a dentist, testified that he routinely treats temporomandibular joint dysfunction (TMD) in his practice. He explained that, in TMJ dysfunctions, the joints and discs are not working properly and that there is usually muscle spasm that causes the patient pain. Dr. Warren testified that he first saw Taylor on March 1, 1996, and treated her through October 8, 1996. He stated that she had numerous complaints of pain resulting from the accident. He diagnosed her as having TMD and concluded that her jaw was not opening straight after conducting

3

several tests. He also noted subjective popping in that joint. Dr. Warren opined that the accident had caused the ensuing TMJ problems including an elongation and tearing of the ligaments. He treated Taylor with a splint to wear during the day as well as a different one to wear at night and described having to wear them as "tolerable" in order to get relief from the pain. Dr. Warren also testified that some of Taylor's baby teeth had to be removed and that he had to refer her to an oral surgeon to remove the remaining roots. He stated that Taylor should have naturally lost the teeth by that point, but since she had not, he probably would have had to remove them anyway. But, Dr. Warren stated they need to be removed in order to move forward with the splint therapy. He also referred Taylor to Valerie LeBas of Rehabilitation Associates of Lafayette for physical therapy, explaining that sore back muscles also contribute to TMJ problems. By early October, Dr. Warren testified that Taylor's neck and shoulder pain had decreased by eight percent, the clicking, snapping, and popping in her jaw had ceased, and her headaches had decreased by ninety percent.

Dr. Warren also referred Taylor to Drs. Guidry and Harkins for the placement of braces, to aid in her pain relief by positioning the teeth in a more comfortable position. However, Dr. Warren stated TMJ problems are usually "for life" and that he believed she would need future medical treatment for this disorder. However, he had no idea what the costs of her future medical treatment might be.

On cross-examination, Dr. Warren testified that his records indicated that Taylor opened her jaw to thirty-eight millimeters, which he found to be within normal limits. He also testified that Taylor stated that she did not have any problems prior to the accident. However, he did not ask detailed questions regarding whether she

4

clenched her jaw. He further testified that, at the May 2, 1996 appointment, Taylor reported that she had no headaches or popping in her jaw as long as she wore her splint, but that she had lost it. Records dated June 17, 1996, indicate that Taylor reported no headaches, decreased neck and shoulder pain, and no clicking, popping, or snapping on her right side. The same indications were made at appointments on the following dates: June 27, 1996, July 1996, August 5, 8, and 15, 1996, September 10, 1996, and October 8, 1996.

Dr. Warren testified that stress is a significant contributing factor with TMJ problems. He further stated that he agreed with the studies that indicate that anywhere from forty to sixty percent of the population has signs of TMJ dysfunction. Finally, he testified that he felt Taylor's TMJ problems were caused by the accident and not by stress.

Dr. Hendry, Taylor's lifelong dentist, in a letter sent to Dr. Warren, stated that Taylor had been a patient in his practice since November 1985, and that she had neither been diagnosed nor reported having TMJ problems.

Dr. H.A. McConnell, an oral and maxillofacial surgeon, first saw Taylor on May 21, 1996, on referral from Dr. Warren to completely remove two baby teeth. In June 1998, Dr. McConnell removed two more baby teeth and surgically exposed the two impacted cuspids and attached chains and brackets in order for her orthodontist to move the teeth down via braces. In May 2000, Taylor's wisdom teeth were removed, which required her jaw to be propped open while under sedation. In June 2000, at the request of Dr. Kirby Guidry, the two cuspids were re-exposed and new brackets attached. Dr. McConnell stated that the impacted baby teeth and the

5

impacted wisdom teeth had nothing to do with the accident.

Dr. John Humphries, an orthopedic surgeon, currently in practice as an orthopedist, testified that he examined Taylor on June 10, 1996, and conducted an examination of her that revealed tenderness in her neck, poor neck motion, and tenderness in her lower back. He testified that x-rays revealed plate abnormalities at C4, C5, and C7, however, he stated they were probably developmental in nature. He did not see fractures, healed fractures, or dislocations. He determined that the neck injury was a sprain or a stretch of the muscles and ligaments and that the headaches were compatible with post-traumatic headache disorder. Dr. Humphries also stated that Taylor had lumbar strain in her lower back. At her July 23, 1996 visit, Taylor reported clicking and popping in her jaw, pain from her neck that radiated to her left forearm, and back pain. On September 10, 1996, she related having severe neck pain for the two days prior to the appointment. MRI results from tests conducted in the interim between the July and September visits came back normal, however, Dr. Humphries stated that, with sprain and strain type injuries, the scans often come back normal. Taylor's next visit was on October 22, 1996, at which time she reported improvement in her back, but continued neck pain, numbness in her left arm, and jaw pain. Dr. Humphries noted no spasm in her neck, stating that involuntary muscle spasm is not a common physical abnormality. Taylor returned on August 20, 2002, at which point Dr. Humphries scheduled another MRI. The August 28, 2002 MRI was unremarkable revealing no traumatic injury. Dr. Humphries stated that the most likely cause of Taylor's neck and back problems were chronic sprain and strain injuries. Dr. Humphries also stated that he did not feel she was exaggerating her

6

symptoms. Taylor reported no previous injuries or treatment to her neck and back area.

Dr. Iley Harkins, Jr., D.D.S., an orthodontist, first saw Taylor on June 20, 1997, on referral by Dr. Warren. Dr. Harkins stated that, when he met Taylor, she denied being in pain, but that his clinical examination of her revealed extreme hyperactivity (muscle spasms) in the musculature surrounding her neck, head, upper back, posterior and anterior neck muscles, and deep, and superficial muscles. He testified that he put braces on Taylor's upper teeth on September 22, 1997. By December 21, 1998, Dr. Harkins noted in his records some slow movement of Taylor's teeth. At a February 23, 1998 visit, x-rays were taken to see how her teeth were moving. Dr. Harkins noted that Taylor reported having pain in the areas of the muscles that supported her head, neck, and upper back and her temporomandibular joint. Dr. Harkins testified that the last time he saw Taylor was in late July 1999. He stated that she then began treating with his partner, Dr. Guidry. Dr. Harkins testified that the long arduous process was really wearing on Taylor and she was bothered by how long it was taking. Dr. Harkins testified that he did not feel that she was exaggerating her complaints of pain and that her complaints were substantiated by objectively measured muscle spasms. He also stated that he believed Taylor would continue experiencing these same sorts of problems in the future as the sort of damage she experienced is not reversible. Dr. Harkins testified that the removal of the baby teeth and movement of the cuspids, were not necessary, but for the accident. Dr. Harkins stated that the primary reason for the orthodontic work was so that Taylor would not have to wear splints for the rest of her life.

7

Dr. James Pierce, a specialist in temporomandibular joint dysfunctions, testified that one of the symptoms of TMD is headaches and referred pain into the neck and back, which can exacerbate the TMJ discomfort. Dr. Pierce testified that he first saw Taylor on August 9, 1999, at which time she complained of jaw pain, headaches, and neck pain that radiated into her shoulders. She also complained of sensitive teeth and dizziness, discomfort when chewing and opening her jaw, popping in her jaw, and clenching and grinding her teeth during the night. Dr. Pierce conducted an EMG scan on Taylor, which measures hyperactivity (spasm) in muscles. He stated that the scan indicated she was having spasms in her neck and shoulders. Dr. Pierce also testified that he could hear her jaw popping. He stated that Taylor had a displaced disc in both of her jaw joints causing her joints to stay inflamed. This, in turn, caused her jaw muscles to spasm which led to headaches and facial or jaw pain. Dr. Pierce recommended that she have her four impacted wisdom teeth removed and that she resume wearing a splint in addition to the braces.

Dr. Pierce testified that most TMJ disorders can be managed with conservative treatment. He made a splint for Taylor, prescribed anti-inflammatory and muscle-relaxing medications, and ordered physical therapy. Dr. Pierce stated, that based on the history provided by Taylor, the accident was more likely than not, the cause of her current problems. Dr. Pierce last saw Taylor on August 29, 2001, at which time she rated her pain level at a seven on a scale of one to ten, with ten being the most discomfort. Dr. Pierce also agreed that a significant portion of the population, between forty and sixty percent, exhibit some signs of TMJ. He further testified that micro traumas, such as clenching and/or grinding the teeth (bruxism), can

8

lead to TMJ disorders. Dr. Pierce stated that bruxism and stress are significant factors in TMJ disorders. In fact, he testified that he believed stress was the number one factor contributing to TMJ dysfunction. He also testified that Taylor missed numerous scheduled appointments, which hindered her progress because she was not able to receive adjustments on her splint. He also testified that she did not go to physical therapy, which was another factor hindering her progress.

Dr. John Martin, a specialist in pain management, first saw Taylor on September 11, 2000, at which time she complained of pain in her jaw, neck, lower back, and hip. Dr. Martin examined Taylor and found that she had tenderness over the jaw structures, particularly on the right side over the temporomandibular joint. He diagnosed her with myofascial pain syndrome, myofascial meaning the involved area of the body is muscle, and temporomandibular joint arthritis. He also testified that he believed Taylor's complaints were legitimate and that she was not magnifying them. Dr. Martin prescribed anti-inflammatory medications. At this visit, Taylor indicated her pain level was a five on a scale of one to ten. Dr. Martin next saw Taylor on March 7, 2000, at which time he noticed clicking in both temporomandibular joints and spasm in her jaw. He increased the anti-inflammatory medication to the maximum daily dosage. Her pain level remained the same. At the next visit on March 22, 2001, Taylor indicated that her pain level had increased to a seven. Her next appointment was on August 22 ,2001, and she reported severe facial and jaw pain and stated that she had not slept for four days. She graded her pain at a nine out of a ten. Dr. Martin prescribed a different stronger muscle relaxant. Taylor's next appointment was on October 16, 2001, and she stated that she was still experiencing insomnia and

mild tenderness over both TMJ joints. At her next visit on February 14, 2002, Taylor complained of neck and face pain and reported being in motor vehicle accidents on December 22, 2001, and on January 24, 2002. Taylor graded her pain at a six that day. Her next appointment was on May 6, 2002, and she was having severe TMJ pain; surgery was scheduled at Ocshner with Dr. P.J. Walters, an oral maxillofacial surgeon. On August 7, 2002, Taylor complained of jaw and neck pain. She graded her pain level at a seven. Dr. Martin stated that he felt she was honest and forthcoming. He admitted that if she did have TMJ arthritis it would have shown up on the MRI.

Dr. James McAndrew, a specialist in the field of TMD, conducted an IME on Taylor on September 28, 2001. He found that Taylor was suffering from TMD and felt, more probably than not, it was caused by the accident, especially since she never displayed signs of TMD at her regular dentist appointments. Dr. McAndrew recommended that Taylor undergo an arthroscopy and an auriculotemporal block to determine if her headaches were associated with the TMD or from her cervical pain. Dr. McAndrew felt that Taylor had been misdiagnosed by Dr. Warren. He further felt that her bicuspids did not need to be brought down in the midst of the splint therapy to help her TMD, but that the event had nothing to do with the accident.

Dr. Robert Martinez, a neurologist and expert in sleep disorders, saw Taylor once on December 10, 2001, upon referral from Dr. Martin. At that time, he recommended some methods to aid her in sleeping better. Dr. Martinez stated that, from his limited contact with Taylor, he believed the primary component of her sleep disorder was pain from the TMJ, based on the history she gave him.

Dr. P.J. Walters, an oral maxillofacial surgeon, saw Taylor for the first time on February 25, 2002, at which time she reported the same types of problems as before, which she had been experiencing for about seven years, since the accident. He ordered an MRI, which Taylor underwent on March 27, 2002. The MRI showed no abnormal results, but Dr. Walters stated that arthrosporic surgery to clean out the inflamed area could benefit Taylor. Taylor underwent the arthroscopy on March 29, 2002. Dr. Walters found that there was no pathology on the right side and stated that it appeared to be a fairly healthy normal joint. He stated that the joint on the left side had some mild inflammatory response in the surrounding tissues.

Dr. Walters testified that, following the arthroscopy, Taylor reported a decrease in headaches. He last saw her on July 22, 2002, at which time she reported that she was not doing any better. Dr. Walters recommended lifestyle modifications Taylor could make, such as stress reduction to prevent her from clenching her jaw. However, he said that he did not feel she was a candidate for surgery and that a repeat arthrosporic surgery would be of no benefit to her. Dr. Walters explained that the inflammation on the left side might explain why she is having so many problems, but that he could not say for certain that it was attributable to the accident because so much time had elapsed. He said that Taylor did not appear to exaggerate her symptoms. He stated that both joints opened and closed normally on the MRI, but that a negative MRI did not rule out inflammation. Dr. Walters disagreed with Dr. McAndrew's assessment that the orthodontic work did not follow from the initial problems following the accident. He felt that the orthodontic work flowed from the avoidance of having to wear a splint for the rest of her life.

11

Ryan Ringuet testified that he has known Taylor for approximately four years and is currently dating her. He stated that he met her after the car accident. Ringuet testified that Taylor is limited in what she can eat and that she can only eat soft foods, but nothing that requires her to open her mouth wide, such as a po-boy; requires pulling, such as pizza; or is too chewy, such as steak. He stated her study habits have been affected and that she has a hard time dealing with the pain. Ringuet testified that Taylor sometimes cries because she is in so much pain and often wakes in the middle of the night. He stated that he sometimes massages her neck and jaw to ease the pain. Ringuet further testified that Taylor has missed classes at the University of Louisiana, Lafayette, because of the pain. He also stated that, following her wisdom teeth removal, she was in excruciating pain for days because her jaw was locked open for such a long period of time.

Taylor, who was twenty-three at the time of trial, testified as to the details of the car accident. Following the accident, she stated that her face, neck, and lower back hurt, and that she was experiencing tingling in one of her arms. She stated that, prior to the accident, she had never had any face or jaw pain, or any headaches, back pain, or neck pain of any significance. She described the aggravation and pain of having to wear the splints. She also stated that Dr. McConnell's removal of her teeth was very painful. She went on to describe the other procedures and the pain associated with them, and stated that her jaw still locks up. She testified that her grades suffered because she missed a lot of school.

However, on cross-examination Taylor was questioned as to whether her parents divorce or her unplanned pregnancy, which she kept a secret for nine months,

12

may have led to the stress contributing to her TMJ, poor grades, and sleeping problems. Taylor admitted that she did not disclose the pregnancy to Allstate because she felt it was "private." Taylor also denied being involved in an accident in April 1993, that led her to receive treatment from Pinhook Chiropractic.

After reviewing all of the testimony, we find that the jury did not abuse its discretion in awarding Taylor $50,000 in general damages. Clearly the jury felt that the accident did indeed contribute to her TMJ, back, and neck problems. However, there was substantial testimony that many other factors in Taylor's life were the contributing cause of her poor grades and TMJ flare-ups. Considering this evidence, the jury's award is affirmed, and this assignment of error is dismissed as being without merit.

**Special Damages**

Taylor argues that the jury erred in failing to award future medical expenses. The law is well-settled that the plaintiff bears the burden of proving that she will incur future medical expenses. In *Carrier v. Nobel Ins. Co.*, 01-983, p. 3 (La.App. 3 Cir. 2/6/02), 817 So.2d 126, 134-35, *writs denied*, 02-0728, 02-739 (La. 5/10/02), 815 So.2d 843, 845, we stated:

> In order to recover for future medical expenses, the plaintiff must establish the amount of the award with some degree of certainty. *Cormier v. T.H.E. Ins. Co.,* 97-1143 (La.App. 3 Cir. 5/27/98); 716 So.2d 387; *rev'd on other grounds,* 98-2208 (La.9/08/99); 745 So.2d 1. An award for future medical expenses "will not be made in the absence of medical testimony as to the requirements for such expenses and their probable cost." *Id.* at p. 11; 716 So.2d at 395; *quoting Rowe v. State Farm Mut. Auto. Ins. Co.,* 95-669, p. 20 (La.App. 3 Cir.); 670 So.2d 718, 730, *writ denied*, 96-0824 (La.5/17/96); 673 So.2d 611. In *Veaezey v. State Farm Mutual Auto Insurance,* 578 So.2d 5, 8 (La.App. 3 Cir. 1991), this court explained:

> Future medical expenses, like any other damages must be established with some degree of certainty. The plaintiff must show that, more probably than not, these expenses will be incurred. Awards will not be made in the absence of medical testimony that they are indicated and setting out their probable cost. An award for future medical expenses cannot be based on mere speculation of the jury. Much stronger proof, such as medical testimony of the specific expenses to arise, should be required for such an award. (*Citations Omitted.*)

We find no error in the jury's refusal to award future medical damages. The record was void of any testimony as to need and cost of such care other than Dr. Warren's claim that Taylor would probably have TMJ problems "for life" and would require future medical care, at an unspecified cost, and Dr. Harkins' claim that she would probably have problems in the future. We find no error in the jury's finding that this evidence was insufficient to establish a claim for future medical damages. This assignment of error is without merit.

### ARBITRARY AND CAPRICIOUS

Taylor argues that the jury erred in finding that Allstate was not arbitrary, capricious, and without probable cause in making its tenders. Allstate's tenders to Taylor, beginning from the accident and up through trial, totaled $80,579. Taylor's main argument is that Allstate failed to adequately compensate her for her pain and suffering over the six year period. We disagree. We reviewed adjuster Lois Hebert's extensive testimony regarding the method and manner used in making these distributions. We find no manifest error in the jury's finding that Allstate was neither arbitrary, capricious, nor without probable cause as there was no testimony that Allstate failed to tender undisputed amounts. Thus, Allstate is not subject to penalties and attorney's fees pursuant to La.R.S. 22:658 and 22:1220. This assignment of error

is without merit.

## EVIDENCE

Lastly, Taylor urges that the trial court erred in excluding a document stating that the Pinhook Chiropractic Clinic records, indicating that she received treatment there due to an "April 1993 accident" was an error and that it was a default setting on the computer program. Taylor's step-father, who worked at Pinhook, obtained a document from Pinhook stating that it was a misprint. However, Allstate's counsel objected to the admission of the letter for numerous reasons, and the trial court agreed that it should be excluded. We agree that this letter constituted hearsay in the most classic sense, which is not admissible. *See* La.Code Evid. arts. 801-02.

La.Code Evid. art. 103(A) states in pertinent part that an "error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected." In *State Farm Mutual Automobile Insurance Co. v. Little*, 34,760, p. 6 (La.App 2 Cir. 5/20/01), 794 So.2d 927, 930, the court stated: "In reviewing evidentiary decisions of the trial court, an appellate court must consider whether the particular ruling complained of was erroneous and if so, whether the error prejudiced the complainant's cause, for unless it does, reversal is not warranted."

We find no manifest error in the trial court's ruling. Even if it was in error, it was harmless and did not affect a substantial right. Taylor and Dr. Morvant, both testified there was no accident and the treatment was maintenance oriented. This assignment of error is without merit.

## CONCLUSION

The jury's award in favor of the plaintiff-appellant, Alexis D. Taylor, is

15

affirmed.  All costs of this appeal are assessed to Taylor.

**AFFIRMED.**