947 So.2d 171 (2006)
Evano Joseph CHAISSON, Jr., Sharon Marie Chaisson Duffourc and Belinda Ann Delaune Pauli
v.
AVONDALE INDUSTRIES, INC., Formerly Known as Avondale Shipyards, Inc., Garlock, Inc., Uniroyal, Inc., Eagle, Inc., Formerly Known as Eagle Asbestos and Packing Co., Inc., Reilly-Benton Company, Inc., et al.
No. 2005-CA-1511.
Court of Appeal of Louisiana, Fourth Circuit.
December 20, 2006.
Opinion Denying Rehearing January 31, 2007.
*176 Louis L. Plotkin, Louis L. Gertler, Gertler, Gertler, Vincent & Plotkin, L.L.P., New Orleans, LA, for Evano Chaisson, Jr., Sharon Duffourc & Belinda Pauli.
Richard J. Tyler, Madeleine Fischer, Jones Walker Waechter Poitevent Carrere & Denegre, Kay Barnes Baxter, Craig R. Watson, Margaret Casey, Barfield & Associates, P.A., New Orleans, LA, for H.B. Zachry Company.
(Court composed of Judge MICHAEL E. KIRBY, Judge TERRI F. LOVE, Judge DAVID S. GORBATY).
TERRI F. LOVE, Judge.
This appeal arises from the death of Lucresia Ann Chaisson caused by asbestos related mesothelioma. Her husband and two major daughters filed suit against multiple defendants, including past employers of her husband, Evano Chaisson, Jr., alleging that household exposure to asbestos from washing his work clothes caused her mesothelioma. All defendants settled and/or were dismissed prior to trial except for H.B. Zachry Company. The jury found H.B. Zachry 42.58% negligent and *177 awarded $1,416,580.54 in survival damages and wrongful death damages of $1,370,000 to Evano Chaisson, Jr. and $562,000 to each major daughter. H.B. Zachry appeals asserting the trial court and jury committed numerous errors regarding its alleged duty to Mrs. Chaisson, negligence, fault allocation, damage awards, and jury charges. Lucresia Ann Chaisson's family appealed seeking an increase in survival damages. We find the trial court did not commit legal error and that the jury was not manifestly erroneous. Therefore, we affirm.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY
Evano Chaisson, Jr. ("Mr.Chaisson") married Lucresia Ann Chaisson ("Mrs. Chaisson)" on June 6, 1964. They resided on the Westbank their entire marriage. Mrs. Chaisson worked at the Canal Street, Gretna, and Marrero Woolworth stores for approximately forty-two to forty-five years. She rode the bus to work and Mr. Chaisson would pick her up at the end of the day. Every night, Mrs. Chaisson shook off Mr. Chaisson's work clothes, washed them, and swept up the dust and residue on the floor.
Mrs. Chaisson died from malignant pleural mesothelioma on August 9, 2001. Following her death, Mr. Chaisson and Mrs. Chaisson's two major daughters, Sharon M. Duffourc ("Mrs. Duffourc") and Belinda Pauli ("Mrs. Pauli"), collectively referred to as the plaintiffs, filed suit against Avondale Shipyards, Inc. ("Avondale"), Garlock, Inc., Uniroyal, Inc., Eagle, Inc., Reilly-Benton Company, Inc., the McCarty Corporation, Maryland Casualty & Surety Company and the Fidelity and Casualty of New York, Insurers of Marquette Insulations, Inc., Foster Wheeler Corporation, Combustion Engineering, Inc., H.B. Zachry Company ("Zachry"), Union Carbide Corporation ("Union Carbide"), Shell Oil Company ("Shell"), and Kellogg Brown & Root, Inc. ("Brown & Root") seeking damages based on alleged negligence on the premise that Mrs. Chaisson contracted mesothelioma as a result of household exposure to asbestos from repeatedly washing Mr. Chaisson's asbestos dust coated work clothes.

Avondale Shipyards
After receiving an honorable discharge from the Army, Mr. Chaisson worked at Avondale Shipyards from 1963 to 1976, and approximately 1982 to 1986. Mr. Chaisson worked as a pipefitter, pipefitters' helper, and foreman of the pipefitters at Avondale's Main, Westwego, and Harvey Quick Repair Yards. Mr. Chaisson performed tacking, a short process type of welding, in a pipe shop for installation into new ships. He testified that he did not work with asbestos insulation or gaskets while in the pipe shop. After working in the pipe shop for approximately a year, Mr. Chaisson testified that he became a pipefitter helper on new construction work and remained in that position.
As a pipefitter, Mr. Chaisson worked on the building of new ships, such as the Lykes ships and Coast Guard cutters. He bolted pipes together with and without gaskets in all parts of the ships, including the engine room, boiler room, and living quarters. He installed asbestos Garlock and Flexitallic gaskets. However, he testified that he only "occasionally" installed gaskets while working on the new ships. Mr. Chaisson stated that he got covered in grayish white fiber when he "fooled with the gaskets." Additionally, Mr. Chaisson stated that he passed through areas of the new ships where employees were performing other insulation work.
Mr. Chaisson stated that he also worked as a pipefitter repairing ships such as the U.S.S. Sanctuary and the Tappa Hanock. *178 While repairing the U.S.S. Sanctuary, for up to a year, Mr. Chaisson stated that he removed asbestos insulation and gaskets, which also had to be cleaned or "scraped" off. He also had to remove asbestos insulation from the Tappa Hanock and some small tugboats. Mr. Chaisson stated that other than the above ships, he did not remove any other asbestos insulation. After finishing the repair work, Mr. Chaisson stated that his clothes were dusty. Mr. Chaisson also came into contact with asbestos containing blankets "on rare occasions" because the blankets would be covering some of the piping.

H.B. Zachry
From 1976 to 1978, Mr. Chaisson worked as a pipefitter for Zachry at the Union Carbide plant in Taft, Louisiana. He worked as a pipe foreman for the last few months with Zachry, but he continued some manual work along with his new supervisory duties. Mr. Chaisson testified that he performed construction work in the Olefins II unit. He testified that general repair work was conducted throughout the plant. Although he clarified that Union Carbide was the official maintenance crew, he stated that he would run and remove pipe, including the insulation on them, according to sketches or instructions. Mr. Chaisson characterized his time working for Zachry as twenty percent helping to construct the Olefins II Unit and eighty percent doing general repair work.
Cajun Insulators removed pipe covering and insulation on large jobs, but residue and some insulation remained. Mr. Chaisson's foreman instructed him to remove the remainder of the insulation. Mr. Chaisson stated that he removed old insulation from the old pipes about fifty to sixty percent of the time while completing repair work at the plant. After doing so, his clothes were covered in white, flaky dust.
Mr. Chaisson also performed demolition work, like separating flanges. The flanges contained studs covered in insulation that he had to cut loose and remove. He testified that he performed a great deal of demolition in the Acid Unit.[1] His foreman, employed by Zachry, instructed him to enter the Acid Unit and "demolish it from top to bottom." This included cutting all of the insulation loose, letting it fall to the ground, and tearing out the pipes. Demolishing the Acid Unit took approximately three weeks. Mr. Chaisson again reiterated that his clothes were covered in dust and dirt while working on the Acid Unit.
Mr. Chaisson testified that he worked with Garlock, Flexitallic, and other named gaskets in the Olefins II Unit. While conducting the general repair work around the plant, Mr. Chaisson stated that he worked with gaskets, changed valves, and cleaned off the flanges. He stated that Zachry issued him the knife used to clean off the flanges and scrape the gaskets and that the Zachry foreman also told him to remove the gaskets. Additionally, Mr. Chaisson stated that he worked in fire boxes about ten to fifteen times that were lined in fuzz type blankets, from the Zachry tool room, to prevent fire from escaping the box.
Zachry required Mr. Chaisson to wear white paper suits when he could come into contact with chemical residue while breaking lines. Zachry also required respirators for work with possible exposure to chemical vapors. Mr. Chaisson stated that *179 he wore a shield and goggles when cutting pipes containing chemicals. Zachry required a work permit, obtained by the foreman, to enter into any existing unit other than new construction.

Trial
All of the defendants settled and/or were dismissed with the exception of Zachry. Zachry filed a motion for summary judgment seeking to dismiss the claims. The trial court denied the motion and Zachry proceeded with an eight-day jury trial. The jury's answers to interrogatories contained inconsistencies. The trial court then instructed the jury to "redo" questions three through seven. Following completion, the jury assessed fault as follows:

 Avondale Industries, Inc. 37.5%
 Garlock, Inc. 7.5%
 H.B. Zachry Company 42.58%
 Johns Mansville 8.68%
 Shell Oil Company .83%
 Union Carbide Corporation 2.91%

The jury awarded $1,416,580.54 in survival damages, $1,370,000 in wrongful death damages to Mr. Chaisson, and $562,000 in wrongful death damages each to Mrs. Duffourc and Mrs. Pauli.
The trial court entered judgment based on the jury's findings in favor of the plaintiffs as follows:

Survival Damages $472,193.45
Wrongful Death Damages (Mr. Chaisson) $ 583,346
Wrongful Death Damages (Mrs. Duffourc) $239,299.60
Wrongful Death Damages (Mrs. Pauli) $239,299.60

All awards were reduced according to Zachry's 42.58% fault and with legal interest from the date of judicial demand. The survival damages were reduced based on a four-sixths reduction according to the plaintiffs' settlements with four of the six joint tortfeasors. The plaintiffs filed a motion to tax costs. The trial court taxed $5,110 in costs against Zachry. The plaintiffs then filed a motion to amend judgment due to an error in calculation. The trial court amended the judgment to reflect the mathematical error and assessed costs against Zachry for $6,043.86. Zachry filed a motion for a new trial/judgment notwithstanding the verdict/remittitur, which the trial court denied. Zachry's suspensive appeal timely followed.
Zachry asserts the trial court erred by: 1) finding it owed a duty to Mrs. Chaisson to protect her from asbestos fibers on her husband's clothes and by denying its JNOV on the issue; 2) finding that Mrs. Chaisson's risk of contracting mesothelioma was within the scope of Zachry's duty and by denying its JNOV on the issue; 3) refusing to give Zachry's requested jury charge number four based on reasonable foreseeability; 4) excluding the testimony of Truman Strahan as hearsay; 5) finding that Zachry was negligent; 6) excluding requested jury charge number seventeen on the duty of a premises owner; 7) entering judgment on the jury's allocation of fault; 8) denying Zachry's motion for summary judgment regarding La. R.S. 9:2772 and if not, then by excluding requested jury charges twelve and thirteen based on La. R.S. 9:2772; 9) entering judgment on the jury's wrongful death awards because the amount exceeded what a reasonable jury could assess under the circumstances. The plaintiffs assert in a cross-appeal, that the jury manifestly erred when it reduced the original survival damages by Zachry's percentage of fault in the revised verdict form.

STANDARD OF REVIEW
Factual findings of the jury are reviewed using the "manifest error" or "clearly wrong" standard. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Reviewing and reversing the factfinder's determinations involves a two-part test developed by the Louisiana Supreme Court. Mart v. Hill, 505 So.2d 1120, 1127 (La. 1987). This test requires the reviewing *180 court to find that no reasonable factual basis exists for the trial court's findings and that the findings are wrong or "manifestly erroneous" according to the record. Id. The record must be reviewed in toto to discern whether the factfinder was clearly wrong. Stobart v. State, Through Dept. of Transp. and Dev., 617 So.2d 880, 882 (La. 1993). The trial court has a "better capacity to evaluate live witnesses." Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973). Therefore, "the appellate court must determine if the factfinder's decision was a reasonable one." Norfleet v. Lifeguard Transp. Serv., Inc., 05-0501, p. 5 (La.App. 4 Cir. 5/17/06), 934 So.2d 846, 852. "[W]here two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." Stobart, 617 So.2d at 883.
Appellate courts review legal errors with a de novo standard. Overton v. Shell Oil Co., 05-1001, p. 8 (La.App. 4 Cir. 7/19/06), 937 So.2d 404, 410.
In order to grant a judgment notwithstanding the verdict ("JNOV"), the jury's verdict must be "unsupported by any competent evidence." Selico v. Intercontinental Bulktank Corp., 98-0763, p. 9 (La.App. 4 Cir. 5/12/99), 733 So.2d 1240, 1245, citing Boudreaux v. Schwegmann Giant Supermarkets, 585 So.2d 583, 586 (La.App. 4th Cir.1991). "A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict." Anderson v. New Orleans Pub. Serv., Inc., 583 So.2d 829, 832 (La.1991). A JNOV is reviewed determining whether the trial court committed error in denying the JNOV based upon the above criteria. Id. A JNOV "completely abrogates and nullifies" the "basic, mandated and well established role of the jury" and "must always be reviewed with great care and caution." Davis v. Lazarus, 04-0582, p. 8 (La.App. 4 Cir. 3/8/06), 927 So.2d 456, 461-62.

DUTY/RISK
Louisiana uses the duty/risk analysis to resolve most negligence cases. Andry v. Murphy Oil, U.S.A., Inc., XX-XXXX-XX-XXXX, p. 24 (La.App. 4 Cir. 6/14/06), 935 So.2d 239, 255, reh'g denied, (8/15/06). To establish negligence the plaintiff must prove: 1) duty of care to the plaintiff; 2) breach of the duty; 3) cause-in-fact; 4) legal causation (scope); and 5) damages. Boykin v. La. Transit Co., 96-1932, p. 8 (La.3/4/98), 707 So.2d 1225, 1230. "Generally, the outset determination in the duty-risk analysis is cause-in-fact." Id. However, the essential element in the case sub judice is whether Zachry owed a duty to Mrs. Chaisson.

Duty
Duty is a question of law that is subject to de novo review on appeal. Faulkner v. McCarty Corp., 02-1337, p. 2 (La.App. 4 Cir. 6/11/03), 853 So.2d 24, 27. This Court must consider if "the plaintiff has any law (statutory, jurisprudential, or arising from the general principles of fault) to support that the defendant owed him a duty." Lemann v. Essen Lane Daiquiris, Inc., 05-1095, p. 8 (La.3/10/06), 923 So.2d 627, 633. The Louisiana Civil Code provides that "[e]very act whatever of man that causes damage to another obliges him by those whose fault it happened to repair it." La. C.C. art. 2315. "Generally, a duty is defined as the obligation to conform to the standard of conduct associated with a reasonable man in like circumstances." Fox v. Bd. of Supervisors of Louisiana State University and Agric. and Mech. Coll., 576 So.2d 978, 981 (La.1991). "There is an almost universal duty on the part of the defendant in negligence cases *181 to use reasonable care so as to avoid injury to another." Boykin, 96-1932, p. 10, 707 So.2d at 1231.
Louisiana courts "must make a policy decision in light of the unique facts and circumstances presented." New Orleans Train Car Leakage Fire Litig., 00-0479, p. 47 (La.App. 4 Cir. 6/27/01), 795 So.2d 364, 394. The court may take "various moral, social, and economic factors" into account when determining whether to impose a duty. Id. These factors include: 1) "the fairness of imposing liability;" 2) "the economic impact on the defendant and on similarly situated parties;" 3) "the need for an incentive to prevent future harm;" 4) "the nature of defendant's activity;" 5) "the potential for an unmanageable flow of litigation;" 6) "the historical development of precedent;" and 7) "the direction in which society and its institutions are evolving." Id. Overall, finding a duty is dependent on the "facts and circumstances of the case and the relationship of the parties." Fox, 576 So.2d at 981.
Mr. Chaisson worked for Zachry from 1976 to 1978, performing various tasks as a pipefitter and a pipefitter foreman. He testified that his clothes were covered in dust at the end of each day. Mr. Chaisson and Mrs. Chaisson's two major daughters also testified that Mrs. Chaisson shook Mr. Chaisson's clothes every evening prior to laundering them. Mrs. Chaisson then swept up the residue from the clothes. The plaintiffs assert that this dust was a substantial factor in Mrs. Chaisson's development of mesothelioma. Accordingly, they allege that Zachry owed a duty to protect Mrs. Chaisson from the dangers of asbestos fibers that Zachry allegedly knew Mr. Chaisson could be carrying home every night.
Zachry asserts that it did not have a duty to protect third parties who come into contact with asbestos fibers on the clothes of its employees away from the workplace. Zachry alleges that this case is distinguishable from our decision in Zimko, which found that a premises owner held a duty to third parties who contract an asbestos related disease from household exposure to asbestos. Zimko v. Am. Cyanamid, 03-0658, p. 23 (La.App. 4 Cir. 6/8/05), 905 So.2d 465, 483, reh'g denied, (7/15/05), writ denied, 05-2102 (La.3/17/06), 925 So.2d 538. As a "construction contractor," Zachry stated that the work performed by its employees "was tightly controlled by Union Carbide, who set the conditions on the permits they issued." Zachry avers that "[t]o impose such a duty would require Zachry to control the conduct of both Union Carbide on the work site (by insuring that Union Carbide did not deviate from its stated procedures for preventing others from being exposed to asbestos) and Mr. Chaisson off the work site."
This Court, in the case of a premises owner, held that an employer has a "general duty to act reasonably in view of the foreseeable risks of danger to household members of its employees resulting from exposure to asbestos fibers carried home on its employee's clothing, person, or personal effects." Zimko, 03-0658, p. 23, 905 So.2d at 483. In Zimko, the plaintiff's husband died from asbestos related mesothelioma allegedly caused by his household exposure to asbestos fibers carried home on his father's work clothes. Id. at p. 2, 905 So.2d at 470-71. The decedent's father "had no direct involvement in the asbestos abatement projects." Id. at p. 4, 905 So.2d at 472. Thus, this Court held a premises owner liable for the asbestos related death of plaintiff's husband due to his household exposure as a child. Additionally, in regards to possible third party exposure to HIV, this Court held that a hospital owed a duty to its employee's wife after her husband was exposed to HIV tainted *182 blood. Vallery v. S. Baptist Hosp., 630 So.2d 861, 868-69 (La.App. 4th Cir.1993). This Court found an "ease of association" and foreseeability "that a security guard negligently exposed to HIV will be married and will have unprotected sexual relations with his wife unless promptly warned of his HIV exposure." Id. 630 So.2d at 868. Thus, the hospital owed a duty to a third party, the wife.
In deciding Zimko, this Court looked to the jurisprudence of other states to determine whether a duty should be owed to a third party household member. Specifically, this Court relied upon New York City Asbestos Litig. v. A.C. & S., Inc., 14 A.D.3d 112, 786 N.Y.S.2d 26 (2004) and agreed that it was "hardly a quantum leap to extend the duty of care owed to employees to members of the employee's household who predictably come into routine contact with the employee's clothing." Zimko, 03-0658, p. 24, 905 So.2d at 483, quoting New York City Asbestos Litig., 786 N.Y.S.2d at 34.
Zachry asserts that Zimko's reasoning and holding is no longer good law because the Court of Appeals of New York reversed the Supreme Court, Appellate Division's decision on which this Court previously relied. This emphasis is misplaced. Zachry fails to recognize the distinguishable facts in the New York case. In New York City Asbestos Litigation v. A.C. & S., Inc., 5 N.Y.3d 486, 806 N.Y.S.2d 146, 840 N.E.2d 115, 116 (2005), the employer "issued five uniforms" to the employee and "offered a laundry service." However, the employee chose to bring his work clothes home "about half of the time" because the employer did not provide showers. Id. The court held that the plaintiff's employer was not liable because it was dependent upon its employee's "willingness to comply with and carry out such risk-reduction measures." Id. 840 N.E.2d at 120. Also, the court was reluctant to expand a categorical duty because limitless amounts of third parties could come into contact with workers covered in asbestos. Id. 840 N.E.2d at 122. In the case sub judice, Zachry did not provide work uniforms, changing rooms, or laundering services. Thus, the reasoning for reversing the lower court does not automatically undermine the holding of Zimko or prevent this Court from finding a general duty applied to the facts and circumstances of this case.
Zachry also relies upon a Georgia Supreme Court case to assert that no duty is owed in third party exposure cases. CSX Transp., Inc. v. Williams, 278 Ga. 888, 608 S.E.2d 208 (2005). CSX involved household exposure to the plaintiffs from their fathers' work clothes. Id. 608 S.E.2d at 888. The court declined to extend a duty based on policy reasons involving foreseeability and the possibility of limitless liability. Id. 608 S.E.2d at 890-91. CSX is distinguishable from the case sub judice because Louisiana relies more heavily upon foreseeability in its duty/risk analysis than Georgia does in determining negligence. Additionally, limitless liability would not be created in this case if we found a duty under these particular facts and circumstances.
In Exxon Mobil Corp. v. Altimore, 2006 WL 3511723, *1, ___ S.W.3d ___ (Tex.App.12/7/06), the Texas Court of Appeal declined to extend a duty, under the facts of the particular case, to an employee's wife who allegedly contracted mesothelioma as a result of fibers released into the air while she laundered her husband's work clothes. The court relied heavily upon the foreseeability of a third party contracting an asbestos related disease due to household exposure. Id. at ___, at *2. The asbestos exposure in that case was from 1942 to 1972 prior to the *183 first release by Occupational Health and Safety Administration's ("OSHA") of standards regarding the dangers of carrying home asbestos fibers to household members. Id. at ___, at *3. The court found "knowledge of the risks of asbestos exposure reached the point" where "asbestos research realized asbestos might pose a risk beyond the workplace" by 1974. Id. at ___, at 7. However, the court held that no duty existed because the "take-home risk of asbestos exposure" was not revealed to Exxon until the release of OSHA's 1972 regulations and warnings. Id. at ___, at *8. Exxon Mobil is factually distinguishable from the present case because Mr. Chaisson worked for Zachry from 1976 to 1978 after OSHA revealed the risks of household exposure to asbestos. Therefore, the foreseeability reasoning used by the Texas Court of Appeals is inapplicable.
The Supreme Court of New Jersey unanimously found a duty to protect from household asbestos exposure in Olivo v. Owens-Illinois, Inc., 186 N.J. 394, 895 A.2d 1143, 1149 (2006). Olivo stressed the importance of foreseeability in determining whether a duty exists. Id. 895 A.2d at 1148. However, "[o]nce the ability to foresee harm to a particular individual has been established . . . considerations of fairness and policy govern. . . ." Id. The court found that notice of the dangers of asbestos dust came as early as 1937 and that Exxon Mobil did not provide precautions to prevent employees from carrying dust home. Id. 895 A.2d at 1149. Limiting liability, the court curtailed the duty to extend only to the particular "foreseeability of harm to the plaintiff's wife." Olivo, 895 A.2d at 1150. The court reasoned that this restriction would appease "public policy concerns about the fairness and proportionality of the duty." Id. Olivo also provides guidance in the respect that the party found to owe a duty, Exxon Mobil, was not the party primarily responsible for protecting workers from asbestos contact. Id. Similarly, Zachry asserts that Union Carbide, as the premises owner, was the primary party responsible in guarding against asbestos exposure.
Like Louisiana jurisprudence, Olivo relied heavily upon foreseeability when finding a duty. Considering the above, we find that the facts of this case are analogous to Zimko and Olivo. A reasonable company in similar circumstances of Zachry, a company aware of the 1972 OSHA standards regarding the hazards of household exposure to asbestos, had a duty to protect third party household members from exposure to asbestos from a jobsite it knew contained asbestos.
In considering the moral, social, and economical factors of imposing a duty, we find that public policy also weighs in favor of finding a duty. First, the economic impact of imposing a duty on Zachry is minimal. The fact that this case presents res nova determinations for this Court demonstrates the small number of cases. Second, there is a public policy need to prevent future harm like this from occurring. If courts allow employers to turn a blind eye to potential work hazards simply because they are hired by someone else, companies may be more likely to rely upon others' representations and perform no safety inspections of their own. Third, the possibility of limitless liability is of no concern because finding a duty in this case would not create a categorical duty rule, but one based upon the facts and circumstances of this case. Fourth, the historical precedent and development of institutional guidelines show that courts are holding companies liable for negligence based on unsafe work conditions. This desire for accountability is also shown in the strengthening of OSHA regulations to allow for minimal *184 asbestos exposure to workers and none to household members. Finally, public policy favors a duty in this case where a "construction contractor" took no independent steps to protect its employees' family members from household exposure to hazardous materials.
Therefore, applying the general duty of a company with knowledge of the presence of asbestos and OSHA's 1972 standards, as described above, and applying it to the facts and circumstances of this case, not finding a categorical duty rule, we do not find that the trial court erred on the determination that Zachry owed a duty to Mrs. Chaisson to guard against her household exposure to asbestos from laundering her husband's work clothes. We do not find that the trial court erred in denying Zachry's JNOV.

Breach of Duty/Negligence
This Court "must accord great deference to the facts found and the inferences drawn by the finder of fact" because the breach of duty "is a question of fact, or a mixed question of law and fact." Boykin, 96-1932, p. 11, 707 So.2d at 1231. The determination of a breach of duty will not be reversed absent a showing of manifest error or that it was clearly wrong. Rosell, 549 So.2d at 844.
A premises owner's duty to protect employees of independent contractors requires "reasonable steps to ensure a safe working environment." Thomas v. A.P. Green Indus., Inc., 05-1064, pp. 8-9 (La. App. 4 Cir. 5/31/06), 933 So.2d 843, 852. However, this responsibility does not relieve the contractor of its own duty. Therefore, Zachry may have breached its duty to Mrs. Chaisson, in spite of Union Carbide's own possible breach of its duty.
Mr. Chaisson testified that he worked for Zachry at the Union Carbide plant in Taft as a pipefitter and pipefitter foreman from 1976 to 1978. He stated that he spent eighty percent of his time performing repair work and twenty percent working on constructing the Olefins II unit. He also stated that the asbestos insulation removal company, Cajun Insulators, left insulation on the gaskets, flanges, and pipes, but that his foreman, who worked for Zachry, told him to scrape off the residue with a knife issued from the Zachry tool room about fifty to sixty percent of the time. Mr. Chaisson also stated that, to his knowledge, his foreman never tested the insulation remaining on the pipes before instructing him to remove it. He also testified that he worked with what he thought were asbestos blankets in the fire boxes.
Mr. Chaisson testified that his foreman told him to "demolish" an existing Acid Unit "from top to bottom." During the demolition, Mr. Chaisson stated that that "insulation was flying all over the place" and that when they dropped pipes down from the unit that dust would rise fifteen feet in the air. Lastly, he said the dust appeared to be the same as the dust from Avondale. On cross-examination, Zachry confronted Mr. Chaisson with deposition testimony in which he stated that he might have worked for Brown & Root when he demolished the Acid Unit. However, at trial he testified that he was positive it was while he worked for Zachry. The jury weighed the statement's credibility.
Mr. Chaisson stated that he attended an orientation, but that he was not told to avoid working with asbestos. Additionally, Zachry held safety meetings once a week, but Mr. Chaisson stated that no warnings about asbestos were given. He testified that he did not have any involvement in the permitting process while working as a pipefitter.
Although no one informed him that the gaskets or insulation contained asbestos, *185 Mr. Chaisson testified that they looked the same as the asbestos products that he worked with at Avondale. He further stated that his clothes were covered with "white dusty stuff" and that this residue also appeared to be the same as the asbestos residue from Avondale. Zachry required Mr. Chaisson to wear a white paper suit and a respirator if he was working in an area where he might come into contact with chemical vapors. Mr. Chaisson also wore goggles when demolishing the Acid Unit. He was not given any protective gear when working with pipe covering, gaskets, or while in the fire boxes. He stated that he was also not told that wearing his residue covered clothes home could harm him or his family.
Frank Parker ("Mr. Parker"), the plaintiffs' industrial hygienist, testified about asbestos characteristics and the information available to the industry regarding the hazards of household asbestos exposure. He stated that asbestos insulation was a "white, chalky, crumbly type of insulation." Although he stated that he could not tell the difference between asbestos containing insulation and non-asbestos insulation, but that "there are people who can." Mr. Parker stated that OSHA began to regulate asbestos exposure in the early 1970s.
Mr. Parker discussed eleven documents regarding Union Carbide's knowledge of asbestos in the plant and studies related to household exposure. First, a set of Union Carbide documents proved that the Taft plant had gaskets and pipe insulation that contained asbestos. One document stated that the plant contained white asbestos gaskets and blue African asbestos gaskets, which would be consistent with Mr. Chaisson's description of the gaskets he worked with at Taft. Mr. Chaisson described some of the Taft gaskets as being grayish blue in color with various brand names. In fact, Zachry's counsel stated in court "there is no dispute there was asbestos in these facilities." However, Zachry's counsel limited himself by stating that he did not "stipulate it was on every pipe everywhere."
Mr. Parker testified that the 1972 OSHA standards, which required laundering services, showers, and changes of clothes for employees with a certain exposure level, demonstrated industry knowledge of the potential for "substantial contamination of the workers" and the harm the asbestos could cause to workers' household members. He agreed that after OSHA's 1972 regulations, asbestos contaminated work clothes were not intended to go into the home.
Mr. Parker relied upon a document titled "Malignant Mesothelioma in Occupational Exposure to Asbestos, a Clinical Pathological Correlation of 1,445 Cases," which stated that the number one occupation associated with mesothelioma was pipefitters. "Safety," another article relied upon by Mr. Parker, from 1913, discussed the dangers of bringing poisonous clothes into the home. The National Safety Council released an article in 1963, "Dusts, Fumes, and Mists in Industry," which stated, "contaminated work clothes should not be taken home where a toxic dust could contaminate the home or expose other members of the family." "Diffuse Pleural Mesothelioma and Asbestos exposure in North Western Cape Province," from 1960, which identified the development of mesothelioma in housewives of miners of asbestos in South Africa. Another article by P.G. Harries in 1968 established the existence of mesothelioma in housewives of shipyard workers exposed to asbestos, particularly insulation. "Household-Contact Asbestos Neoplastic Risk" published by Mount Sinai School of Medicine in 1976 specifically documents the risk of household exposure to asbestos.
*186 Zachry's industrial hygienist witness, William Dyson ("Mr.Dyson"), testified that Mrs. Chaisson's most likely exposure to asbestos came from environmental exposure by living on the Westbank, where the Johns Manville plant was located and ultimately where the Environmental Protection Agency established a Superfund site in the 1990s. However, Mr. Chaisson stated that he was unaware of any Johns Manville scraps used at any of his and Mrs. Chaisson's homes. Additionally, their home was not included as a part of a Superfund clean up site. Lastly, Mrs. Duffourc testified that the bus route her mother took to work did not pass by either the Johns Manville or Celetex plants on the Westbank.
Mr. Dyson stated that home exposure would require: 1) friable asbestos containing materials; 2) the materials would have to be manipulated (turned into dust); 3) clothing contamination; 4) the dust to remain on the clothes until the person arrived at home; 5) the dust had to be liberated into the air; and 6) the person must be exposed to a "biologically meaningful dose." He also testified that Taft procedures stated that all pre-1976 insulation must be treated as containing asbestos. In his view, scraping off insulation from gaskets would create small exposure to Mr. Chaisson and that the fire blankets provided for some contamination risk.
On cross-examination, Mr. Dyson stated that more likely than not, the pipe insulation in the existing units contained asbestos and that not all of the asbestos in the plant would have been marked. He stated that Zachry would have been aware of OSHA's 1976 standards. Mr. Dyson testified that either the jury must take the view that Mr. Chaisson was exposed at Avondale and Zachry, but that environmental factors were the most significant risk or that all three sources contributed. He reviewed twenty-five cases of mesothelioma from the Westbank. All of the cases alleged occupational or household exposure. In his view, some of the cases had no traceable occupational exposure to asbestos. However, he did not consult with any Westbank doctors.
Truman Strahan ("Mr. Strahan"), a worker at Taft for Zachry, testified that Cajun Insulators removed all of the asbestos insulation at Taft. He also stated that Zachry workers had to have a safe work permit from Union Carbide to perform all old plant work. He stated that they were "told to stay away from the asbestos and not work in it." However, Mr. Strahan never supervised pipefitters and stated that he was not aware of what every pipefitter was doing. Further, Mr. Strahan stated that he never checked to see if Cajun Insulators removed enough of the insulation before the Zachry employees arrived to finish the work. To his knowledge, Zachry never tested the air for asbestos. On redirect, Mr. Strahan testified that the pipes were clean and that he never told employees to break the rules.
Thaddeus Porada ("Mr. Porada"), a Union Carbide employee from 1968 to 2001, testified that he did not see anyone break the rules. He stated that all asbestos insulation was removed at Taft by 1972. Mr. Porada said that Union Carbide tried to identify asbestos ties-ins ahead of time and mark them. According to him, Union Carbide followed safety procedures for sampling and identifying asbestos insulation, which Cajun Insulators would remove. He further testified that he never witnessed a Zachry employee tacking off insulation. However, Mr. Porada was temporarily reassigned to South Charleston from 1977 to 1979, while Mr. Chaisson worked at Taft, and only returned to Taft about once a month.
*187 On cross-examination, Mr. Porada stated that he had no personal knowledge about whether Mr. Chaisson's foreman ordered him to remove remaining asbestos insulation. He testified that Union Carbide did not have the personnel to see if the contractors were doing what they were supposed to be doing "on every job." Finally, Mr. Porada said that the Taft plant had "a lot of asbestos in it."
Phillip Griffin ("Mr.Griffin"), who worked for Zachry at Union Carbide as an instrument technician, testified that he worked around pipefitters almost everyday. However, he did not supervise pipefitters and stated that he did not know what Mr. Chaisson's foreman asked him to do. Mr. Griffin testified that Zachry did not have a rule prohibiting employees from wearing work clothes home.
The jury determines the credibility of the witnesses and weighs their testimony. As such, Mr. Chaisson testified that he was exposed to asbestos more while working for Zachry due to the fact that he spent eighty percent of his time on repair work with asbestos insulation left behind by Cajun Insulators. Additionally, Mr. Chaisson testified that he was ordered to demolish the Acid Unit and was not told to avoid asbestos.
The jury weighed presented testimony and evidence whereby it concluded that Mr. Parker's testimony regarding Zachry's knowledge of OSHA standards and the knowledge and foreseeability of a worker's household members contracting asbestos related diseases as a result of contaminated work clothes was credible. Mr. Dyson, Zachry's industrial hygienist also testified that Mr. Chaisson's asbestos exposure at Taft could be a contributing factor in Mrs. Chaisson's contraction of mesothelioma. Also, Mr. Strahan, Mr. Porada, and Mr. Griffin testified that they did not know what work Mr. Chaisson's foreman ordered him to complete. Mr. Porada testified that Union Carbide did not have enough supervisors to oversee every Zachry worker.
Both the plaintiffs and Zachry presented an industrial hygienist witness, who presented testimony regarding what work Mr. Chaisson performed and whether Zachry tried to protect its employees and their families from asbestos exposure. The jury also heard testimony from Mr. Chaisson, other Zachry employees, and a Union Carbide employee. As a result, the jury concluded that a reasonable company in similar circumstances as Zachry, a company aware of the 1972 OSHA standards regarding the hazards of household exposure to asbestos, would have taken precautions on a job site it knew contained asbestos. Considering the above testimony presented at trial, we cannot say that the jury committed manifest error in finding that Zachry breached its duty to Mrs. Chaisson and was negligent.

Cause-in-Fact
Cause-in-fact is a factual determination, which the jury discerned in the case sub judice. Perkins v. Entergy Corp., 00-1372, 00-1387, 00-1440, p. 9 (La.3/23/01), 782 So.2d 606, 612. In cases involving "concurrent causes" of an injury/accident, "the proper inquiry is whether the conduct in question was a substantial factor in bringing about" the injury/accident. Id., at p. 8, 782 So.2d at 611. The Louisiana Supreme Court has applied the test by determining that "each of the multiple causes played so important a role in producing the result that responsibility should be imposed upon each item of conduct, even if it cannot be said definitively that the harm would not have occurred `but for' each individual cause." Id., at pp. 8-9, 782 So.2d at 612, quoting Graves v. Page, 96-2201, p. 9 (La.11/7/97), 703 So.2d 566, 570. The Louisiana Supreme Court *188 reiterated that one factor used in examining whether a cause is a substantial factor includes "whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm. . . ." LeJeune v. Allstate Ins. Co., 365 So.2d 471, 475, quoting Restatement of Torts, 2d, Section 433(b). The plaintiff is required to prove that the defendant's conduct constituted a substantial factor in causing the injury by a preponderance of the evidence. Id., at p. 8, 782 So.2d at 612.
Robert Kessler ("Dr. Kessler"), the plaintiffs' medical oncologist witness and the doctor who performed some treatment on Mrs. Chaisson, testified that he has worked with over 150 cases of mesothelioma in employees and their family members. Dr. Kessler stated that Mrs. Chaisson's exposure came from Avondale and Mr. Chaisson's work for Zachry at Union Carbide and not from the environment. In reference to environmental exposure he stated, "I've never seen any patients with any history of that type of exposure." Dr. Kessler testified that third party exposure from work clothes is recognized in medical literature and that Mr. Chaisson's work for Zachry falls within the latency period of mesothelioma. Finally, Dr. Kessler stated that all of Mr. Chaisson's occupational exposures substantially contributed to Mrs. Chaisson's exposure.
First, Zachry permitted Mr. Chaisson to wear allegedly contaminated work clothes home that Mrs. Chaisson laundered everyday. Second, according to Mr. Chaisson, Zachry did not warn him about asbestos. Third, Mr. Strahan stated that he was unaware of any air tests conducted by Zachry. Fourth, Mr. Strahan did not inspect the pipes for insulation left by Cajun Insulators. Fifth, neither of Zachry's employee witnesses or its Union Carbide witness could say definitively whether Mr. Chaisson's foreman ordered him to remove asbestos insulation. Therefore, Zachry created a series of forces that could be perceived as being a substantial factor in Mrs. Chaisson's death. Also, the jury weighed and accepted Mr. Dyson's last suggested scenario in which they felt that Avondale, Zachry, and environmental exposure contributed to Mrs. Chaisson's mesothelioma. Accordingly, we do not find that the trial court committed error by entering a judgment based on the jury's finding that Zachry was a substantial factor in Mrs. Chaisson contracting mesothelioma.

Legal Causation/Scope of Duty
The legal causation or scope of duty inquiry "assumes a duty exists and questions whether the injury the plaintiff suffered is one of the risks encompassed by the rule of law that imposed the duty." Roberts v. Benoit, 605 So.2d 1032, 1044 (La.1991). The Louisiana Supreme Court stated that there is "no `rule' for determining the scope of duty." Id. Scope is "ultimately a question of policy as to whether the particular risk falls within the scope of the duty." Id. Determining whether a harm is within the scope of duty is also very fact intensive. Roberts, 605 So.2d at 1045. "[L]ogic, reasoning and policy decisions" help the court to determine if liability exists according to the particular facts and circumstances of the case. Id. Courts use foreseeability as a way of determining whether a harm is encompassed within a duty. Id. However, the ease of association doctrine is also employed. Roberts, on rehearing, stated that the ease of association doctrine includes policy considerations as well as the element of foreseeability. 605 So.2d at 1054. The Court stated that factfinders should ask: "[i]s the harm which befell the plaintiff easily associated with the type of conduct engaged in by the defendant?" Id.
*189 Zachry asserts that the risk that Mrs. Chaisson would contract mesothelioma from laundering Mr. Chaisson's work clothes was not within the scope of its alleged duty to her. Zachry argues that the studies relied upon by the plaintiffs did not specifically relate to the dangers of asbestos exposure to families of workers in petrochemical plants or those who did "not regularly work directly with pipe insulation." Additionally, Zachry said "it had been led to understand by Union Carbide's policies and procedures that Zachry employees would not be exposed to asbestos-containing pipe insulation, and that removal of such material would be handled by the specialist, Cajun Insulators." Lastly, Zachry asserts that the asbestos fire blankets Mr. Chaisson used were not known to cause a significant risk to employees or the employees' families.
The plaintiffs assert this Court should determine "whether Zachry could have foreseen that asbestos (from whatever source) could have been brought home on Mr. Chaisson's clothes" instead of from a specific source, such as gaskets or blankets.
This Court must determine if Mrs. Chaisson's death, caused by mesothelioma, was easily associated with the type of work engaged in by Zachry. We answer in the affirmative. Zachry stipulated that the Taft plant contained asbestos. It also stated that it knew pipe insulation containing asbestos was being removed by Cajun Insulators before its employees repaired the gaskets. The studies and articles presented by the plaintiffs demonstrate, prior to 1976, that asbestos contaminated clothing was hazardous to the workers and those in their household. Additionally, the 1972 OSHA standards revealed that asbestos fibers/dust was dangerous and should not be carried home.
As such, Zachry knew its workers could be exposed to asbestos: if workers carried the asbestos home, their family members would be exposed as well. First, asbestos was present in the plant. Second, if Cajun Insulators failed to remove all of the pipe insulation, Zachry's employees would come directly into contact with it each time they worked on gaskets or any other piping. Third, Mr. Strahan stated that he never inspected pipes for remaining insulation before allowing his employees to commence work. Fourth, Zachry's assertion that no study specific to pipefitters, who do not regularly work with asbestos insulation, and their families was available in 1976 is an attempt to split legal hairs. The other studies presented the danger to workers and families. Even if the studies on mine workers were excluded, Zachry had notice of OSHA's standards. Fifth, policy, logic, and reasoning demonstrate a need for Mrs. Chaisson's injuries to be included in Zachry's scope of duty. Construction contractors should not be allowed to turn a blind eye to their employees when they have specific knowledge of the possibility of asbestos exposure.
Accordingly, we find that there is an ease of association under these facts and circumstances between Mrs. Chaisson's mesothelioma and the work performed by Mr. Chaisson for Zachry. The trial court did not err by entering judgment on the jury's findings that Mrs. Chaisson's injuries fell within the scope of Zachry's duty nor by denying Zachry's JNOV.

Damages
The damage issue in the case sub judice is undisputed as Mrs. Chaisson passed away from mesothelioma on August 9, 2001.
Accordingly, we hold that Zachry breached its general duty, under the facts and circumstances of this case, to Mrs. Chaisson by putting her in foreseeable risk *190 of contracting an asbestos related disease from household exposure from laundering her husband's work clothes. Therefore, the jury did not err in finding Zachry negligent.

PROPOSED JURY CHARGES
Refusing to admit jury instructions constitutes an error of law when it is "prejudicial" by "materially" affecting the result and depriving "a party of substantial rights." Lam v. State Farm Mutual Auto. Ins. Co., 03-0180, p. 4 (La.App. 4 Cir. 4/1/05), 901 So.2d 559, 564; rev'd in part on other grounds, 06-2361 (La.11/29/06), 946 So.2d 133. By using the manifest error standard, the court presumes that the jury utilized the correct law. Rathey v. Priority EMS, Inc., 04-0199, p. 27 (La.App. 4 Cir. 1/12/05), 894 So.2d 438, 458, reh'g denied, (2/24/05), writ denied, 05-0789 (La.5/6/05), 901 So.2d 1107, writ denied, 05-0802 (La.5/6/05), 901 So.2d 1108.
The appellate court will conduct a de novo review "if the jury applied the incorrect law because of erroneous jury instructions" and it "could have affected the jury's decision." Id. at pp. 27-28, 894 So.2d at 459. De novo review is used only if the jury charges precluded "the jury from reaching a verdict based on the law and the facts." Jones v. Liberty Mut. Ins. Co., 568 So.2d 1091, 1094 (La.App. 5th Cir.1990). The reviewing court considers "the circumstances of the case and the instructions as a whole, and should measure the `gravity or degree of error.'" Rathey, 04-0199, p. 28, 894 So.2d at 459, quoting Jones v. Liberty Mut. Ins. Co., 568 So.2d 1091, 1094 (La.App. 5th Cir.1990). "Ultimately, the determinative question is whether the jury instructions misled the jury to the extent that it was prevented from dispensing justice." Nicholas v. Allstate Ins. Co., 99-2522, p. 8 (La.8/31/00), 765 So.2d 1017, 1023.

Foreseeability/Requested Jury Charge Four
Zachry asserts the trial court legally erred by refusing to include a specific jury charge regarding foreseeability. Zachry's proposed jury instruction stated:
In order to find the defendant's conduct substandard, you must also determine whether a reasonable person under all circumstances surrounding his conduct, would have reasonably foreseen as a result of his conduct, some such injury as Mrs. Chaisson suffered, and you must also find that it failed to exercise reasonable care to avoid the injury. In other words, do you think that the standard applicable to the defendant's conduct was meant to cover what happened to Mrs. Chaisson.
In regards to liability, the trial court charged the jury in part, as follows:
In resolving the issues of liability in this case, there are certain rules of law that you must consider. One such rule of law is negligence. The plaintiff claims that the defendants were negligent. Negligence is the doing of some act which a reasonably prudent person would not do or the failure to do something which a reasonably prudent person would do under the particular circumstances at the time.
Malice, ill will, or intent are not necessary elements of negligence. Thus, in determining whether or not a defendant's conduct was negligent, there is no fixed rule. It is to be determined from the facts and circumstances that existed at the time the incident occurred.
Ultimately, the determination of a person's negligence is based upon  based on reasonableness. And if you *191 should conclude that a person has acted as a reasonable and prudent person under the circumstances, then a person cannot be found to be negligent. (Emphasis added).
When Zachry objected to the trial court omitting proposed jury charge four, the trial court reasoned that both parties stipulated to asbestos being located in Taft and that evidence demonstrated that asbestos was hazardous. As to duty and foreseeability, the trial court avowed:
[w]hen you get to the duty that is owed to Ms. Chaisson, and to the extent there was knowledge about the dilatory effects of asbestos, it is reasonably foreseeable that anybody that Mr. Chaisson comes into contact with may be exposed to asbestos.
The trial court also reasoned that no testimony showed that Zachry provided any method to prevent Mr. Chaisson from taking asbestos home on his work clothes. Lastly, the trial court stated: "I think it is sufficiently covered under the negligence [charge]. I don't think we need to do the foreseeability charge."
After reviewing the proposed jury charge and the actual jury charge, we do not find that the trial court committed legal error by omitting proposed jury charge four. The main tenets of the proposed jury charge were subsumed into the actual jury charge. Therefore, we do not find that this had a material affect or prejudiced Zachry. Additionally, the charge did not deprive Zachry of substantial rights, as there is sufficient evidence in the record to support a finding of foreseeability. Thus, a de novo review is not warranted.

Premises Owner/Requested Jury Charge Seventeen
Zachry alleges the trial court committed legal error by excluding its proposed jury charge on the liability of premises owners. The proposed jury charge stated: "[a] landowner has a duty to discover any unreasonably dangerous condition on the premises and either to correct the condition or warn visitors of its existence." By omitting this instruction, Zachry asserts that the jury instruction misled the jury as to the alleged duty of Zachry and that of premises owners, Union Carbide, Avondale, and Shell. As premises owners, they are strictly liable. La. C.C. art. 2317.[2] For strict liability, the person must "prove that the building or appurtenance posed an unreasonable risk of injury and that damage occurred through that risk." Small v. Baloise Ins. Co. of Am., 96-2484, 96-2485, p. 8 (La.App. 4 Cir. 3/18/98), 753 So.2d 234, 241. Once proof of the above elements is established, the owner is responsible unless "the victim, a third person," or "irresistible force" caused the damage. Id. at pp. 8-9, 753 So.2d at 241. A premises owner "has a duty of exercising reasonable care for the safety of persons on its premises and a duty of not exposing such persons to unreasonable risks of injury or harm." Thomas, 05-1064, p. 8, 933 So.2d at 852. "This duty extends to employees of independent contractors for whose benefit the owner must take reasonable steps to ensure a safe working environment." Id. at pp. 8-9, 933 So.2d at 852.
The trial court reasoned that the premises owners' negligence in the case sub judice, would be covered under the jury *192 charge for non-parties. The trial court stated that Zachry sought to insert a strict liability instruction "to find another way for them to load up on Shell on apportionment of fault." Again, the trial court determined that Zachry was trying to find a way to hold premises owners liable under two legal theories. The trial court asserted:
I think what you're trying to do is give them a basis of liability. Under 2323 they are stuck. That's what 2323 says, if you're a non-party and somebody can establish, I think what you're trying to do is establish another basis for it.
After charging the jury with the above instruction on negligence, the trial court stated as to cause-in-fact:
Cause-in-fact. Another rule which you must consider is cause-in-fact. For a plaintiff to recover, he or she must prove that the defendant was not only negligent, but that this negligence was a cause-in-fact in bringing about the injuries which he or she has sustained. Cause-in-fact refers to an act or an omission or failure to act which causes in fact or plays a substantial part in bringing about the injury and damages.
Stated another way, an act will be considered a cause-in-fact of the incident when after all the evidence is considered that you, as jurors, conclude that an act is a substantial factor without which the incident would not have happened.
Also, this does not mean that the law recognizes only one cause-in-fact of an accident or incident or damages consisting of only one factor or thing of the conduct of only one person.
On the contrary, the conduct of two or more persons may operate either independently or together to cause an accident or incident and damages, and in such a case, each may be a cause-in-fact. As to non-party liability, the trial court charged the jury as follows:
There are other companies who are non-parties to this lawsuit whose fault, if any, is relevant to the determination of liability of the defendant. In deciding if anyone was responsible for the plaintiff's injuries, if any, you do not have to limit your inquiry to the parties to this lawsuit. Should you find that the defendant is liable to the plaintiff, you may also consider the fault, if any, of any other non-party companies in causing Mrs. Chaisson's injuries and ultimate death.
Accordingly, coupling this instruction with the above-mentioned jury instructions on negligence and cause-in-fact, we find that the trial court did not commit legal error in omitting Zachry's proposed jury charge on premises owners. The proposed jury charge focused on reasonableness. The trial court charged the jury as to reasonableness and the reasonably prudent person. The jury found Union Carbide, Shell, and Avondale negligent despite the lack of the jury charge. Zachry asserts that the allocations of fault would be higher for the premises owners if the trial court included the jury instruction. However, the jury considered testimony and evidence whereby it concluded that, as stated in Small, supra, the victim, an irresistible force, or third party's fault intervened. Therefore, we do not find that the omission prejudiced Zachry or substantially affected its case. Zachry's substantial rights were not deprived as it put on evidence of the premises' owners liability as non-parties.

HEARSAY
"Hearsay is a statement, other than the one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." La. C.E. art. *193 801(C). Hearsay is generally not admissible. La. C.E. art. 802. If the trial court did commit an error, by including or excluding testimony, the harmless error rule can apply. Taylor v. Allstate Ins. Co., 03-1273, p. 15 (La.App. 2 Cir. 5/12/04), 872 So.2d 621, 630. This is based upon the law that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected." La. C.E. art. 103(A).
Zachry asserts that the trial court abused its discretion by excluding the testimony of Truman Strahan ("Mr. Strahan"), a Zachry worker. Mr. Strahan testified regarding a Zachry-Union Carbide orientation meeting. Zachry asked Mr. Strahan: "Do you remember if asbestos was discussed at this meeting?" Zachry asserts the question sought to "establish that information about asbestos and Union Carbide's safety procedures was conveyed to Zachry employees at orientation." At trial, Zachry argued that Mr. Strahan's answer would show notice. The trial court excluded the testimony on that basis that it was hearsay because it was offered for the truth of the matter asserted, i.e., proof of notice. Zachry alleges this constituted prejudicial error.
Zachry relies upon Buckbee v. United Gas Pipe Line Co., 561 So.2d 76 (La.1990), to show that the question was not offered for the truth of the matter asserted. In Buckbee, the Louisiana Supreme Court allowed in evidence to show evidence of Buckbee's mental state regarding an industry standard. Id. 561 So.2d at 81. However, Zachry overlooks the other hearsay determination in Buckbee in which the Court determined that in order to accept a statement as nonhearsay, the truthfulness of the underlying hypothesis must first be assumed. Id. We find that situation in the case sub judice. To find it reasonable that Zachry was not negligent in regards to asbestos exposure and Mr. Chaisson's dust covered work clothes, this Court must first assume the truth that notice and/or a warning about asbestos was given at the orientation meeting. Therefore, we do not find that the trial court abused its discretion by excluding Mr. Strahan's testimony.
Even if the trial court committed error by excluding Mr. Strahan's response to the orientation question, the error was harmless. Following the hearsay exclusion, Mr. Strahan testified that before beginning work in the old plant, he would have to obtain a safe work permit from Union Carbide. In regards to the permits, he stated: "if they were asbestos . . . they would check that out and make sure that we didn't work in any asbestos area." He further stated that they "were told to stay away from the asbestos and not work in it, as H.B. Zachry Company." Mr. Griffin also testified that they were told to leave pipes with the "red marking on the lines" alone due to asbestos. Thus, evidence regarding notice about asbestos was admitted at trial even with the exclusion of Mr. Strahan's statement. Therefore, we find the trial court did not commit error by excluding Mr. Strahan's statement.

ALLOCATION OF FAULT
Once negligence is established, comparative fault determines the liability of multiple tortfeasors. La. C.C. art. 2323.[3] If multiple tortfeasors settle before *194 trial, the remaining defendant(s) bear the burden of proving the liability of the settling defendants. Hoerner v. ANCO Insulations, Inc., 00-2333, p. 28 (La.App. 4 Cir. 1/23/02), 812 So.2d 45, 66. The allocation of fault is a factual determination made by the jury.
Zachry contends that the jury's allocation of fault between Avondale, Union Carbide, and Zachry was error. Zachry uses its previously alleged errors of jury charges regarding foreseeability and premises owner liability to receive a de novo review of the jury's allocation. De novo review is not warranted as we have found that the trial court did not commit legal error by excluding the proposed jury charges on foreseeability and premises owners. Thus, we must conduct a manifest error review of the jury's allocation of fault as it relates to Avondale, Union Carbide, and Zachry. The jury allocated fault as follows: Avondale 37.5%, Zachry 42.58%, and Union Carbide 2.91%.
While working at Avondale for over a decade, Mr. Chaisson testified that he worked on a short process of welding, called tacking, in the pipe shop. He did not deal with insulation. Mr. Chaisson then became a pipefitter helper and worked on new ships at Avondale. While working on the U.S.S. Sanctuary, for six months to a year, he performed repair work and had to handle asbestos insulation and scrape the gaskets off. He was told that the insulation and gaskets he worked on at Avondale contained asbestos. In regards to the fibers on his work clothes, he stated that it was "white grayish fiber, chunky" and "very dusty." He had to pull the asbestos blankets "off on the piping" on "rare occasions." Upon removal, he stated that it was "[l]ike a heavy snow falls." It was undisputed that Mr. Chaisson was exposed to asbestos the entire time he worked at Avondale. The jury assigned Avondale 37.5% fault.
Union Carbide owned the Taft plant. Therefore, Zachry asserts the percentage of fault assigned to Union Carbide should be larger because it is a premises owner, like Avondale. However, we found that the proposed jury charge on premises owners was subsumed into the trial court's jury instruction as to the fault of non-parties. Accordingly, reasonableness and the possible fault of third parties or other factors could decrease the amount of fault allocated to Union Carbide.
It is undisputed that Union Carbide knew about the asbestos materials in the Taft plant. Testimony at trial demonstrated that it tried to label all asbestos. Union Carbide required a safe work permit before Zachry employees could being work in old sections of the plant. These permits included a section for asbestos. Mr. Strahan testified that Zachry employees were not to work in the asbestos areas. Union Carbide also hired Cajun Insulators to conduct asbestos abatement in the plant, including the removal of asbestos *195 containing pipe insulation. Mr. Porada testified that Union Carbide gave samples of insulation to the Industrial Hygiene Department. If the pipe covering contained asbestos, Union Carbide required a hazardous work permit and Cajun Insulators would remove it. Mr. Porada also stated that it was Zachry's primary responsibility to follow Union Carbide's safety rules. The jury considered Union Carbide's safety rules, the fact that it hired an asbestos abatement crew, and that Zachry was responsible for ensuring its workers followed Union Carbide's rules. As a result, the jury allocated 2.91% negligence to Union Carbide.
Zachry's counsel stipulated that the Taft plant contained asbestos and Mr. Chaisson testified about his alleged exposure at the plant. Mr. Strahan testified that Zachry never sampled the air for asbestos. Mr. Strahan also stated that he did not supervise pipefitters: he never checked if Cajun Insulators removed enough of the insulation. Mr. Porada, who was absent from Taft during most of Mr. Chaisson's time there, testified that he did not know if Mr. Chaisson's foreman ordered him to remove remaining asbestos insulation. He stated that Union Carbide did not have enough personnel to make sure Zachry employees followed the rules. The jury allocated 42.58% fault to Zachry. The jury concluded that Zachry did not follow Union Carbide's safety rules and improperly exposed Mr. Chaisson to asbestos and Zachry did not prevent employees from going home in their work clothes.
Therefore, after a thorough review of the record, we cannot find that the jury committed manifest error in its allocation of fault as it relates to Avondale, Union Carbide, and Zachry.

LA. R.S. 9:2772
The applicable version of La. R.S. 9:2772 read in pertinent part:
A. No action whether ex contractu, ex delicto or otherwise, to recover on a contract or to recover damages shall be brought against any person performing or furnishing the design, planning, supervision, inspection or observation of construction of an improvement to immovable property.
During the time period associated with Mr. Chaisson's exposure, a peremptive period of ten years or ten years and six months existed for actions arising from "the construction of an improvement to immovable property." La. R.S. 9:2772. Peremption is "a period of time fixed by law for the existence of a right." La. C.C. art. 3458. The "right is extinguished upon the expiration of the peremptive period." La. C.C. art. 3458. "Peremption may not be renounced, interrupted, or suspended." La. C.C. art. 3461.

Summary Judgment
Appellate courts review summary judgments de novo according to the same standard and guidelines as trial courts. Reynolds v. Select Properties, Ltd., 93-1480 (La.4/11/94), 634 So.2d 1180, 1183. A summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to a material fact, and that the mover is entitled to judgment as a matter of law." La. C.C.P. art. 966(B). If the mover will not bear the burden of proof at trial, then the mover must prove "that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense." La. C.C.P. art. 966(C).
Zachry asserts the trial court committed legal error by denying its motion for summary judgment because it avers that the contract between itself and Union Carbide *196 was strictly a construction contract covered by peremption in La. R.S. 9:2772. Specifically, Zachry asserts, in the motion for summary judgment, that its work at Union Carbide consisted of constructing:
A. Petrochemical plant facility located on Owner's [Union Carbide] property in Taft, Louisiana consisting of the following:
(a) A 680 million pounds per year olefins plant,
(b) A 500 million pounds per year ethylene oxide plant,
(c) An acrylic acid modernization,
(d) Miscellaneous chemical plant revisions,
(e) Supporting utilities, distribution and general facilities for the above plants.
In their opposition to Zachry's motion for summary judgment, the plaintiffs aver that there is an "issue of material fact as to the nature of Zachry's contract with Union Carbide." They allege that Mr. Chaisson's exposure resulted from maintenance and repair work in pre-existing sections of the plant, which does not fall under the purview of the alleged construction contract. Alternatively, the plaintiffs assert that the gaskets, insulation, and asbestos blankets are not "considered an immovable because they were utilized for protection in repair work performed by Zachry on pre-existing units at Union Carbide." Lastly, the plaintiffs state that the failure to warn claims, which are included in the current version of La. R.S. art. 9:2772, were not included in the version of the statute when the right vested.
The trial court denied Zachry's motion for summary judgment based on the premise that there is a genuine issue of material fact as to whether or not Mr. Chaisson performed any work for H.B. Zachry at the Union Carbide facility in Taft, Louisiana that was outside the scope of the construction contract entered into by Union Carbide Corporation and H.B. Zachry Company.
After conducting a de novo review of the motion for summary judgment, we do not find that the trial court erred in denying Zachry's motion for summary judgment based on La. R.S. 9:2772. First, claims arising from the failure to warn were not included in the applicable version of the statute. Bunge v. GATX Corp., 557 So.2d 1376, 1385 (La.1990); Vasquez v. New Orleans, 562 So.2d 1122 (La.App. 4th Cir.1990). Second, although the contract was entitled a "construction contract," a genuine issue of material existed as to whether Mr. Chaisson's asbestos related work was within the scope of the contract, as stated by the trial court and whether it was strictly a construction contract.
In order for La. R.S. 9:2772 to apply the "contract has to be a contract to build." Poree v. Elite Elevator Servs., Inc., 94-2575 (La.App. 4 Cir. 11/16/95), 665 So.2d 133, 135. La. R.S. 9:2772 does not "limit every action against someone who once built a building." Acad. Park Improvement Ass'n v. New Orleans, 469 So.2d 2, 4 (La.App. 4th Cir.1985). The plaintiffs allege, in their petition for damages, that Mr. Chaisson was involved in demolition work, as a pipefitter and pipefitter foreman, while at the Taft plant. This alleged demolition work presents a question as to whether Mr. Chaisson's repair and maintenance work was within the scope and obligations of the contract, listed (a) through (e) above.
Zachry asserts on appeal that La. R.S. 9:2772 applies to repair and maintenance work as well as construction. However, no Louisiana appellate court has held that this type of asbestos repair and maintenance work is covered by peremption as contained in La. R.S. 9:2772. Therefore, for the above-mentioned reasons, we find *197 that the trial court did not err in denying Zachry's motion for summary judgment due to a then existing issue of material fact.

Jury Charges Twelve and Thirteen
Lastly, Zachry argues that the trial court committed legal error by omitting proposed jury charges twelve and thirteen. The trial court found that the proposed jury charges twelve and thirteen did not apply in this case due to its above holding that La. R.S. 9:2772 was inapplicable. The contract between Union Carbide and Zachry was not admitted into evidence at trial due to the fact that it was incomplete.
Zachry asserts that the "record was replete with evidence upon which the jury could have reasonably found the Zachry contract with Union Carbide was a construction contract, the trial court's usurpation of the jury's role was wholly improper." Mr. Griffin testified about a "construction contract" between Zachry and Union Carbide dated June 4, 1974. Mr. Griffin classified the document as a construction contract and stated that one page was missing. However, he testified that he did not know the motive behind the missing page. The plaintiffs objected to the introduction of the contract into evidence based on the premise that the missing page contained "Article 2," which was "supposed to describe the work being done in the contract." The trial court sustained the objection, but permitted Mr. Griffin to testify as to his knowledge of the contract. Mr. Griffin stated that he was told that the contract called for a "cost plus a fixed fee." He also stated that he never witnessed Zachry employees performing maintenance work at Taft.
Based on the fact that the contract was not entered into evidence or available for further examination and that Mr. Griffin's testimony regarding the contract was minimal, we find this argument is without merit. The jury could not make a decision based upon proposed jury charges regarding evidence not included at the trial.

WRONGFUL DEATH AWARDS
The family of the decedent may seek wrongful death awards if the death is caused by the negligence of another. La. C.C. art. 2315.2.[4] Factfinders are given "much discretion" in assessing damages. La. C.C. art. 2324.1. Therefore, the damage amount is "entitled to great deference on review." Trunk v. Med. Ctr. of La. at New Orleans, 04-0181, p. 9 (La.10/19/04), 885 So.2d 534, 539, citing Wainwright v. Fontenot, 00-0492, p. 6 (La.10/17/00), 774 So.2d 70, 74. Accordingly, appellate courts review general damage awards using the abuse of discretion standard. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993). The elements used to assess wrongful death awards include "loss of love and affection, loss of services, and loss of support." Turner v. Lyons, 03-0186, pp. 11-12 (La.App. 4 Cir. 1/28/04), 867 So.2d 13, 21. There may be opposing viewpoints on an appropriate award, but an abuse of discretion is found only if the award is "beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances." Id. 623 So.2d at *198 1261. Once it is determined that the factfinder abused its discretion, the reviewing court must examine prior awards in similar cases and determine "the highest or lowest point which is reasonably within that discretion." Id. 623 So.2d at 1260.
Zachry asserts the wrongful death awards were "beyond the amounts that any reasonable juror could have found on the evidence presented and must be reduced." In support, Zachry points out that Mrs. Chaisson's two daughters are majors and that neither daughter lived with her or depended on her financially. Zachry also relies on the fact that Mr. Chaisson remarried within a year after Mrs. Chaisson's death. Zachry further alleges that the jury was influenced by the "emotional testimony" of Mrs. Chaisson's family. Lastly, Zachry argues that the jury "included consideration of the personal suffering of family members during the nine months preceding Mrs. Chaisson's death."
Mr. Chaisson was married to Mrs. Chaisson for thirty-seven years. He testified that he and Mrs. Chaisson took many vacations and cruises together. They went to places such as the Smokey Mountains, Branson, Missouri, and Florida for vacations several times. He stated that their relationship was very close. Mr. Chaisson also stated that he and Mrs. Chaisson liked to go dancing, picnicking, and hunting together. He said that she would "get on the back of a four-wheel bike with me, and we would go out to the deer stands together." Mrs. Chaisson worked at various Woolworth locations and Mr. Chaisson would pick her up from work at the end of most of her shifts.
Although Mr. Chaisson remarried within a year, he stated that his new wife helped him recuperate after surgery for prostate cancer. However, Mr. Chaisson testified that he visits Mrs. Chaisson's "graveyard every time there is a high wind because the flowers blow out the vases." He said that he brings Mrs. Chaisson new flowers six to ten times a year. He said, "I have to go" and that he still misses Mrs. Chaisson.
Mrs. Duffourc, aged thirty-four at her mother's death, testified that she lived with her parents for twenty-eight years. Prior to her mom's sickness, she would visit with Mrs. Chaisson "daily." Also, when Mrs. Duffourc became ill, Mrs. Chaisson took care of her after she was discharged from the hospital. Classifying her mom as her dad's "soulmate" and "friend," she stated that her parents' relationship was very good.
Mrs. Duffourc is married with three children and stated that her children were very close to Mrs. Chaisson. Mrs. Chaisson played video games and cards with them. After Mrs. Chaisson's mesothelioma diagnosis, Mrs. Duffourc took one last vacation to Disney World with her mom, dad, husband, and her daughter.
Mrs. Pauli, aged forty at her mother's death, testified that she and her sister would ride the bus with their mother in the mornings to their grandparents' house when she worked. She stated that she "enjoyed just riding on the bus and going with her to work." She said it was a treat in the summertime. Mrs. Pauli stated that after Mrs. Chaisson retired, she was able to spend more time with Mrs. Pauli's three girls. She stated that Mrs. Chaisson liked to go camping with her grandchildren.
Mrs. Pauli stated that she spent at least sixteen hours a day with her mother while she was hospitalized for a brain aneurysm. She said that Mrs. Chaisson was being released from the hospital at about 100% health when they discovered that she had mesothelioma. That left her "devastated." She testified that she would see her mother *199 "just about every day, if not, at least every other day" after Mrs. Chaisson's diagnosis. She further stated that she and her mother were "very close" and that she could ascertain when her mother was in pain by "certain expressions" and the way she moved.
Mrs. Pauli said that her mother, step-dad, and kids would park on the parade routes during Mardi Gras. They spent Mardi Gras together every year. She stated that the first Mardi Gras after her mother died was "very hard." Mrs. Pauli called her mother her "life line." She said "whatever was going on during the day, whether it was good or bad, or I mean, I talked to her. And if it was bad, we kind of worked it out together. I just don't have that anymore."
The judge entered wrongful death damages of $583,346 for Mr. Chaisson and $239,299.60 to Mrs. Duffourc and Mrs. Pauli based upon a 42.58% reduction according to Zachry's percentage of fault. Prior to the reduction based on the jury's allocation of fault, the wrongful death damages were $1,370,000 to Mr. Chaisson and $562,000 to each daughter. In order to determine whether the wrongful death awards constitute an abuse of discretion, this Court must look to similar awards in other cases.
In Zimko, this Court did not disturb an award of $2,500,000 in wrongful death damages to decedent's wife for his death caused by mesohelioma. Recently, this Court reduced a wrongful death award to the surviving spouse of an asbestosis victim. Thomas, 05-1064, p. 41, 933 So.2d at 870. However, this Court reduced the award from $2,750,000 to $1,000,000. Id. at pp. 39-41, 933 So.2d at 869-70. In Thomas, the entire family testified as to their loss at trial and Mrs. Joshua, the decedent's wife, testified that she and her husband were married for forty-eight years. Id., at pp. 40-41, 933 So.2d at 869-70.
Similarly, the Louisiana Supreme Court denied writs in an appellate case that upheld wrongful death awards of $1,000,000 to the surviving spouse and $250,000 to major children of a mesothelioma victim. Roberts v. Owens-Corning Fiberglas Corp., 03-0248, p. 15 (La.App. 1 Cir. 4/2/04), 878 So.2d 631, 644, reh'g denied, (6/28/04), writ denied, 04-1834 (La.12/17/04), 888 So.2d 863. The surviving spouse was married to the decedent for forty-five years. Id. The court stated that the major children "lost a confidant and companion and an excellent grandfather for their own children." Id. at p. 16, 878 So.2d at 644. The court further stated: "they all feel empty at their great loss." Id.
Given the above wrongful death awards, we do not find that the awards constitute an abuse of discretion. While the awards in the case sub judice are a little higher than some previous awards, this jury heard emotional testimony from each member of Mrs. Chaisson's immediate family about how her death impacted their lives. Accordingly, we do not find the jury abused its discretion or that the trial court committed error.

SURVIVAL DAMAGES
Louisiana Civil Code article 2315.1[5] grants the right to pursue a survival *200 action. If the amount of the award "shocks the conscience" it is inappropriate. Riley v. Maison Orleans II, Inc., 01-0498, p. 11 (La.App. 4 Cir. 9/25/02), 829 So.2d 479, 487, quoting Moore v. Healthcare Elmwood, Inc., 582 So.2d 871, 879 (La. App. 5th Cir.1991).
The plaintiffs argue that the "original" survival damage award of $3,192,579.54 that the jury listed on the first set of jury interrogatories should be reinstated. The trial court determined that the jury's answers to questions three through seven were inconsistent and instructed them to "re-do" the questions. After completing the questions for a second time, the trial court judge found no inconsistencies. The jury awarded $1,416,580.54 in survival damages. The plaintiffs assert that the lower number reflects the jury's attempt to reduce the "original" award according to Zachry's 42.58% of fault.
The first set of jury interrogatories is not contained in the record. The trial court judge was within her discretion to order the jury to complete a second set of certain questions contained in the jury interrogatories after she noticed the inconsistencies. La. C.C.P. art. 1813.[6] Additionally, 42.58% of the alleged "original" award is approximately $1,359,400.37, not the final award amount of $1,416,580.54. Therefore, we find that the trial court did not commit manifest error by entering the judgment on the jury's selected survival damage amount.

DECREE
For the above-mentioned reasons, we affirm the judgment of the trial court.
AFFIRMED.

ON REHEARING
PER CURIAM.
The foregoing application for rehearing filed by appellant, H.B. Zachry Company, is denied. However, we issue this per curiam to clarify and address three issues.
First, the Court's opinion does not create a categorical duty rule as the majority stated in our opinion:
Therefore, applying the general duty of a company with knowledge of the presence of asbestos and OSHA's 1972 standards, as described above, and applying it to the facts and circumstances of this case, not finding a categorical duty rule, we do not find that the trial court erred on the determination that Zachry owed a duty to Mrs. Chaisson to guard against her household exposure to asbestos from laundering her husband's work clothes.
As such, Zachry's contention that this Court created a "categorical rule" is without merit.
Second, we omit this Court's previous statement from the majority opinion, which stated:
Mr. Parker relied upon a document titled "Malignant Mesothelioma in Occupational Exposure to Asbestos, a Clinical *201 Pathological Correlation of 1,445 Cases," which stated that the number one occupation associated with mesothelioma was pipefitters.
However, without referencing this article,[1] this Court's opinion examined abundant evidence, including, but not limited to, OSHA's regulations, which supported this Court's finding that Zachry had adequate knowledge of the risks of household asbestos exposure.
Finally, Mr. Chaisson testified that he demolished the inside of the Acid Unit. He did not testify that he demolished the actual unit's exterior structure.
Accordingly, the results of this Court's opinion remain unchanged.
NOTES
[1] At trial, Zachry's counsel presented Mr. Chaisson's deposition testimony in which he stated that he could not be sure if he demolished the Acid Unit while working for Brown & Root or while for Zachry. He insisted at trial that he demolished the unit while working for Zachry.
[2] La. C.C. art. 2317 Acts of other and of things in custody

We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications.
[3] La. C.C. art. 2323 Comparative Fault

A. In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.
B. The provisions of Paragraph A shall apply to any claim for recovery of damages for injury, death, or loss asserted under any law or legal doctrine or theory of liability, regardless of the basis of liability.
C. Notwithstanding the provisions of Paragraphs A and B, if a person suffers injury, death, or loss as a result partly of his own negligence and partly as a result of the fault of an intentional tortfeasor, his claim for recovery of damages shall not be reduced.
[4] La. C.C. art. 2315.2 Wrongful death action reads, in pertinent part:

A. If a person dies due to the fault of another, suit may be brought by the following persons to recover damages which they sustained as a result of the death:
(1) The surviving spouse and child or children of the deceased, or either the spouse or the child or children.
[5] La. C.C. art. 2315.1 Survival action reads, in pertinent part:

A. If a person who has been injured by an offense or quasi offense dies, the right to recover all damages for injury to that person, his property or otherwise, caused by the offense or quasi offense, shall survive for a period of one year from the death of the deceased in favor of:
(1) The surviving spouse and child or children of the deceased, or either the spouse or the child or children.
[6] La. C.C.P. art. 1813 General verdict accompanied by answer to interrogatories reads in pertinent part:

A. The court may submit to the jury, together with appropriate forms for a general verdict, written interrogatories upon one or more issues of fact the decision of which is necessary to a verdict. . . .
. . .
E. When the answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict, the court shall not direct the entry of judgment but may return the jury for further consideration of its answers or may order a new trial.
[1] The referenced article was a proffered exhibit from the trial.